THE STATE EX REL. DONER ET AL. *v.* ZODY, DIR., ET AL.

[Cite as *State ex rel. Doner v. Zody,* 130 Ohio St.3d 446, 2011-Ohio-6117.]

*Eminent domain—Flooding allegedly caused by government-constructed spillway and by government policies for managing lake level—Statute of limitations—R.C. 2305.09(E) applies—Running of limitations period is tolled when act on government's land causes continuing damage to another's property and when government retains control over structure or condition that causes damage—Burden of proof in mandamus cases is clear and convincing evidence—Mandamus is proper vehicle for compelling government to institute appropriation proceedings for taking of private property—Claimant establishes taking in government-induced flooding cases by showing that flooding was either deliberate result of government action or natural, direct result thereof and that flooding is either permanent invasion or inevitably recurring invasion.*

(No. 2009-1292—Submitted September 20, 2011—Decided December 1, 2011.)

IN MANDAMUS.

_____

**SYLLABUS OF THE COURT**

1. Under R.C. 2305.09(E), an action for relief on the grounds of a physical or regulatory taking of real property must generally be brought within four years after the cause of action accrued. (*State ex rel. Nickoli v. Erie MetroParks*, 124 Ohio St.3d 449, 2010-Ohio-606, 923 N.E.2d 588, approved and followed.)

2. When an act carried out on the actor's own land causes continuing damage to another's property and the actor's conduct or retention of control is of a

continuing nature, the statute of limitations is tolled. (*Sexton v. Mason*, 117 Ohio St.3d 275, 2008-Ohio-858, 883 N.E.2d 1013; *State v. Swartz* (2000), 88 Ohio St.3d 131, 723 N.E.2d 1084; and *Valley Ry. Co. v. Franz* (1885), 43 Ohio St. 623, 4 N.E. 88, approved and followed; R.C. 2305.09(E), construed.)

3. Relators in mandamus cases must prove their entitlement to the writ by clear and convincing evidence. (*State ex rel. Pressley v. Indus. Comm.* (1967), 11 Ohio St.2d 141, 40 O.O.2d 141, 228 N.E.2d 631; and *State ex rel. Henslee v. Newman* (1972), 30 Ohio St.2d 324, 59 O.O.2d 386, 285 N.E.2d 54, approved and followed.)

4. Mandamus is the appropriate action to compel public authorities to institute appropriation proceedings when an involuntary taking of private property is alleged. Any direct encroachment upon land that subjects it to a public use that excludes or restricts the dominion and control of the owner over it is a taking of property, for which the owner is guaranteed a right of compensation under Section 19, Article I of the Ohio Constitution. (*State ex rel. Shemo v. Mayfield Hts.* (2002), 95 Ohio St.3d 59, 63, 765 N.E.2d 345; and *Norwood v. Sheen* (1933), 126 Ohio St. 482, 186 N.E. 102, approved and followed.)

5. In eminent-domain cases involving claims of government-induced flooding, the claimant establishes a taking by proving that (1) the flooding is either intended by the government or is the direct, natural, or probable result of government-authorized activity and (2) the flooding is either a permanent invasion or creates a permanent liability because of intermittent, but inevitably recurring, overflows. (*Ridge Line, Inc. v. United States* (Fed.Cir.2003), 346 F.3d 1346; and *Cary v. United States* (Fed.Cir.2009), 552 F.3d 1373, approved.)

––––––––––––––

**MCGEE BROWN, J.**

{¶ 1} This is an action by relators, owners of land located downstream from the western spillway of Grand Lake St. Marys, for a writ of mandamus to compel respondents, the Ohio Department of Natural Resources ("ODNR") and its director, Scott A. Zody,[1] to initiate appropriation proceedings for the physical taking of their property resulting from flooding caused by a spillway constructed by respondents and the state's lake-level-management practices. We find that relators' claim is not barred by the applicable statute of limitations and that they have established a taking; therefore, we grant the writ.

**Facts**

*Grand Lake St. Marys*

{¶ 2} Grand Lake St. Marys ("GLSM") is a man-made lake located in Mercer and Auglaize Counties in Ohio. GLSM was created between 1837 and 1841 as a water source for the Miami-Erie Canal by damming the headwaters of the Wabash and St. Marys Rivers and flooding the area in between. By the early 20th century, the use of the canal had decreased, and the lake's primary purpose changed. In 1949, the state designated GLSM as a state park and placed it under ODNR's authority.

{¶ 3} GLSM is about 8.2 miles long, covers roughly 13,500 acres, and drains an area of about 112 square miles. Without the lake, about 59 percent of the GLSM watershed would drain to the west and eventually into the Mississippi River, and the remaining 41 percent would drain to the east into the St. Marys River and eventually into Lake Erie.

{¶ 4} The dam at GLSM is an earthen embankment about 5,540 feet long. In 1914, a 39.4-foot curved spillway was constructed on the western shoreline of

---

1. This case was instituted against then director Sean D. Logan, but he was subsequently replaced by David Mustine, who has now been replaced by Scott A. Zody as the director of ODNR. Zody is thus automatically substituted as a respondent in this case. S.Ct.Prac.R. 10.2 and Civ.R. 25(D)(1).

the lake that feeds into Beaver Creek. The spillway had a crest elevation of 870 feet above mean sea level and four gated outlet conduits. Between 1985 and 1997, only two of the four gates worked. GLSM discharges water from the western spillway into Beaver Creek, which in turn discharges water into the Wabash River, which flows in a westerly direction from Ohio into Indiana. Although a gate also existed at the eastern end of the lake, that gate had limited discharge capabilities. ODNR thus used the western spillway for virtually all water flow out of the lake.

{¶ 5} A 1978 inspection showed that the western spillway at GLSM could not pass a probable maximum flood[2] without overtopping for 48 hours, which would result in the eventual failure of the dam and catastrophic flooding. This potential for failure presented an unacceptable risk for people and property downstream from the western spillway. In 1988, ODNR raised the crest elevation of the spillway to 870.6 feet by placing four-inch wooden boards at the crest of the old spillway.

{¶ 6} In 1990, ODNR determined that the 39.4-foot spillway needed to be replaced with a 500-foot spillway to pass the probable-maximum-flood test. ODNR began construction of the new spillway in 1996 and completed it in 1997. The new spillway has a crest elevation of 871.5 feet above mean sea level with a 50-foot-long notch in its center at 870.6 feet above mean sea level.

{¶ 7} The redesigned spillway permanently established the four-inch increase in the lake level that ODNR had first achieved in 1988 by placing "stop logs" across the spillway to increase recreational value to boaters at GLSM. ODNR had previously regulated the lake level at GLSM by lowering it through the old spillway's gated outlets by 12 inches almost every winter. However, after the new spillway—which has two 60-inch outlets near the bottom of the

---

2. A "probable maximum flood" has been described as the flood caused by runoff from a probable maximum precipitation.

structure—was built, ODNR considered the lake to be self-regulating; it has not lowered the GLSM lake level since that time, although it has the capability to do so. When ODNR finished building the new spillway, it also modified the eastern outlet of GLSM with a structure that has no flood-management capacity.

*Concerns about New Spillway*

{¶ 8} From the outset of the spillway-replacement project, public officials and private citizens expressed concerns to ODNR and others regarding the possibility of greater flooding downstream along Beaver Creek.

{¶ 9} Keith G. Earley, the Mercer County Engineer at that time, wrote a series of letters and met with ODNR and other officials to express his concern that the new spillway would cause increased flooding on the western side of GLSM that would adversely affect downstream farmers and businesses. Earley later concluded that "ODNR chose to serve recreational users of Grand Lake by maintaining a constant lake level and to avoid any flooding on the southern end of Grand Lake to the detriment of the owners of structures and farmers on the western side of Grand Lake."

{¶ 10} Similarly, the Mercer County Soil and Water Conservation District advised ODNR that it needed to either address or further study the effect of the new spillway on croplands and that it believed that ODNR "has forgotten the farmer, as the * * * design of the spillway will put 4 feet in Beaver Creek itself."

{¶ 11} Finally, the Mercer County Board of Commissioners warned that "any possible adverse [effects] that could occur along the Beaver Creek outlet should be thoroughly evaluated before proceeding further."

*State ex rel. Post v. Speck*

{¶ 12} In May 2001, five landowners of property located downstream from the western spillway of GLSM along Beaver Creek or the Wabash River filed an action for a writ of mandamus against the director of ODNR in the Mercer County Court of Common Pleas. The landowners owned farmland whose

location ranged from less than one mile from the redesigned western spillway to 11 miles away. The common pleas court granted the writ after concluding that ODNR's 1997 modification of the western spillway constituted a taking of the farmers' property because of "frequent, severe and persistent flooding."

{¶ 13} On appeal, the court of appeals affirmed the judgment of the common pleas court after it determined that the court's factual findings were supported by sufficient, credible evidence. *State ex rel. Post v. Speck*, Mercer App. No. 10-2006-001, 2006-Ohio-6339, 2006 WL 3477024, ¶ 76-77.

*Case Leasing & Rental, Inc. v. Ohio Dept. of Natural Resources*

{¶ 14} In 2005, an Ohio corporation filed suit against ODNR in the Ohio Court of Claims, alleging that flood damage to its property caused by the replacement spillway resulted in an unconstitutional taking without just compensation. The corporation owned 21 acres of land adjacent to Beaver Creek, a few hundred yards downstream from the intersection of Beaver Creek and the western shoreline of GLSM. The Court of Claims held that ODNR was liable for the negligent construction and maintenance of the replacement spillway. The court concluded that "ODNR knew or should have known that the installation of the replacement spillway as designed would result in more frequent and more severe flooding to downstream landowners" and that ODNR's "design choice and subsequent lake level management were unreasonable."

{¶ 15} On appeal, the court of appeals affirmed that part of the judgment finding ODNR liable in negligence, but reversed and remanded for further determination on the issue of damages. *Case Leasing & Rental, Inc. v. Ohio Dept. of Natural Resources*, Franklin App. No. 09AP-498, 2009-Ohio-6573, 2009 WL 4809639.

*Mandamus*

{¶ 16} On July 17, 2009, relators, more than 80 landowners,[3] filed this action for a writ of mandamus in this court to compel respondents, ODNR and its director, to initiate appropriation proceedings for the taking of their property. Respondents filed a motion to dismiss, and relators filed a memorandum in opposition. We granted an alternative writ and set a schedule for briefing and presentation of evidence. 123 Ohio St.3d 1404, 2009-Ohio-5031, 914 N.E.2d 203. We later appointed a master commissioner for the limited purpose of receiving evidence and making evidentiary rulings. 123 Ohio St.3d 1435, 2009-Ohio-5611, 915 N.E.2d 659. The parties submitted evidence, and we made various evidentiary rulings. See, e.g., 125 Ohio St.3d 1504, 2010-Ohio-3268, 929 N.E.2d 1069.

{¶ 17} Relators presented substantial, credible lay evidence by way of affidavits, depositions, photographs, and videos to show that following ODNR's 1997 replacement of the western spillway and its concomitant decision to abandon lake-level management, their properties flooded more frequently, over a larger area, for longer periods of time and with greater resulting damage, including crop loss, the deposit of silt, sand, stone, and other debris, drainage-tile failure, soil compaction, and the destruction of trees, bushes, and shrubs. Some of the relators presented evidence that their properties had never flooded until the construction of the new spillway and abandonment of lake-level management.

{¶ 18} Most of the relators have experienced flooding on a frequent basis since the new spillway was built and lake-level management was discontinued,

---

3. The original complaint included 86 relators and over 200 parcels that they owned or had an interest in. On March 12, 2010, we granted relator Kuhn Farms, Inc.'s application to dismiss its claims. *State ex rel. Doner v. Logan*, 124 Ohio St.3d 1512, 2010-Ohio-919, 923 N.E.2d 155. And on March 19, 2010, we granted relators' motion to substitute the estate of Marilyn M. Kuhn in her place. *State ex rel. Doner v. Logan*, 124 Ohio St.3d 1517, 2010-Ohio-1069, 923 N.E.2d 618.

with many experiencing flooding every year and in some years on multiple occasions.

{¶ 19} Relators also presented expert evidence in support of their claims. Their primary expert was Pressley L. Campbell, an engineer with education and experience in hydrology and hydraulics.[4] Based on his previous work as an expert for the relators in *Case Leasing*, as well as his analysis of rainfall records and storm-event data from 1913 to 2006 and lake-elevation readings from 1927 to 2006, Campbell opined that the redesigned spillway caused frequent and severe flooding in the Beaver Creek-Wabash River area.

{¶ 20} Campbell concluded that it was highly unlikely that relators' property downstream from the GLSM spillway would have flooded if the old spillway had been in place and ODNR had continued the lake-level management it had practiced before the 1997 construction of the new spillway. Campbell determined that based upon his analysis of lake-elevation data, if the new spillway had been in place in 1927, 15 storm events between 1927 and 2006 would have resulted in flooding, i.e., an average of one every five years, whereas with the old 39.4-foot spillway and lake-level-management practices in place, only one storm event would have caused flooding.

{¶ 21} Campbell further calculated that since 1997, 73.3 percent of the daily measurements reflected GLSM elevations above 870.6 feet mean sea level, the elevation at which water overflows the spillway and enters Beaver Creek. By contrast, before 1997, the lake elevation was above 870.6 feet for only 21.4 percent of the measurements. Campbell found that since 1997, 26.3 percent of the daily measurements exhibited lake elevations above 871.5 feet mean sea level, the

---

4. Hydrology is "a science dealing with the properties, distribution, and circulation of water," and hydraulics is the "branch of science that deals with practical applications (as the transmission of energy or the effects of flow) of water or other liquid in motion." Webster's Third New International Dictionary (1986) 1109 and 1107.

elevation at which water overflows the entire 500-foot spillway, whereas before 1997, the lake elevation was above 871.5 feet for only 2.4 percent of the measurements.

{¶ 22} Relators also relied on the testimony of Keith Earley, the former Mercer County Engineer who had warned ODNR that its planned redesign of the spillway would result in flooding to downstream farmers on the western side of the lake, and James Moir, an engineer who had criticized the analysis performed by respondents' expert. Finally, relators submitted evidence from *Post* and *Case Leasing*, which involved different properties in the same general area as those at issue here.

{¶ 23} Respondents submitted evidence from ODNR's expert, the consulting firm Stantec. Stantec constructed hydrologic and hydraulic models of the pertinent property using computer programs developed by the United States Army Corps of Engineers. Stantec's hydrologic modeling confirmed greater peak spillway flow from the new spillway when compared to the old spillway for 24-hour 100-year storm events and 96-hour five-year, ten-year, and 100-year storm events.

{¶ 24} For example, the peak spillway flow for a 96-hour five-year rain event for the new spillway was 390 cubic feet per second ("cfs"), which exceeds the 345 cfs peak spillway flow for a 96-hour 100-year rain event for the old spillway. And the 650 cfs peak spillway flow for a 96-hour ten-year rain event for the new spillway exceeds the 480 to 500 cfs capacity for Beaver Creek that ODNR had stipulated to in *Case Leasing*, which would cause Beaver Creek to overtop its banks.

{¶ 25} In Stantec's initial report in March 2010, it concluded that for an event expected to occur once every 15 years (7 percent chance of occurring in any given year), the new spillway causes an increase in depth of flooding up to 1.6 feet directly below the spillway, and the increased depth decreases until about two

miles downstream, when any increased flooding results from local drainage and runoff, not spillway flow. Stantec further found that for an event expected to occur once every 100 years (1 percent chance of occurring in any year), the new spillway causes an increase in depth of flooding up to three feet directly below the spillway, with the depth decreasing until about four miles downstream.

{¶ 26} In sum, Stantec determined that the new spillway increases the duration of out-of-bank flooding for some properties adjacent to Beaver Creek and the Wabash River during both the 15-year and 100-year rain events because of the new spillway, with some properties having increased duration of flooding of up to two days, but that a number of parcels identified in the case are not affected by either increased depth or duration of flooding due to the new spillway.

{¶ 27} In its March 2010 report, Stantec determined that "[b]ecause rainfall events that are likely to cause flooding happen over the entire watershed, when assessing the impacts of the spillway modification, it is not proper to do so without considering the contribution of runoff below the dam; runoff that was present and contributed to flooding problems in Beaver Creek well before the spillway modification." For a 96-hour 15-year rain event, the "spillway flow makes up well under 10% of the overall flow entering the system for both the new and old spillway configurations. This means that the majority of the flooding, especially as the distance downstream of the spillway increases, results from runoff that enters the stream below the spillway and not a direct result of spillway flow itself."

{¶ 28} In a May 26, 2010 memorandum, Stantec responded to relators' expert's questions and concerns by explaining and updating its analysis. The results of the revision showed slightly less effect on the relators' property from the new spillway. Stantec concluded that (1) ten of relators' parcels were affected by increased maximum depth and duration of flooding during a 15-year rain event, (2) 46 parcels were affected by increased duration of flooding during a 15-

year rain event, and (3) 35 parcels were not affected by flows from the new spillway during a 15-year rain event.

{¶ 29} Stantec also concluded that (1) 25 of relators' parcels were affected by increased maximum depth and duration of flooding during a 100-year rain event, (2) 41 parcels were affected by increased duration of flooding during a 100-year rain event, and (3) 25 parcels were not affected by flows from the new spillway during a 100-year rain event. Stantec determined that only 16 of relators' parcels had additional acreage affected by flooding resulting from the new spillway during a 15-year rain event and that only 24 parcels had increased acreage affected during a 100-year rain event.

{¶ 30} Stantec's modeling, however, was flawed because it underestimated the infiltration, or antecedent moisture, of the soil, which affects runoff, and which is therefore important in determining the amount of flooding affecting relators' property.

{¶ 31} In addition, although Stantec attempted to show that increased rainfall was the main cause of the flooding of relators' property, its senior associate could point to only a slight increase in the average number of severe rainfall days after 1997, when the new spillway was completed.

{¶ 32} The parties subsequently submitted briefs, and the Ohio Farm Bureau Federation filed an amicus curiae brief in support of relators. Oral argument was held on September 20, 2011.

### Legal Analysis

*Applicable Statute of Limitations*

{¶ 33} We must first resolve the question of which statute of limitations applies in this case.

{¶ 34} "Under R.C. 2305.09(E), an action for relief on the grounds of a physical or regulatory taking of real property must generally be brought within

four years after the cause accrued." *State ex rel. Nickoli v. Erie MetroParks*, 124 Ohio St.3d 449, 2010-Ohio-606, 923 N.E.2d 588, ¶ 29.

{¶ 35} Thus, as we held in *Nickoli*, the four-year statute of limitations in R.C. 2305.09(E), which was expressly promulgated by the General Assembly to address takings claims, is generally applicable to such claims.

*R.C. 2305.09(E) Does Not Bar the Takings Claim*

{¶ 36} Respondents contend that because relators' claim is based primarily on the 1997 construction of the replacement spillway, their claim is time-barred by R.C. 2305.09(E). Respondents argue that relators or their predecessors-in-title either knew or should have known of any damage allegedly caused by the spillway by 2003 at the latest, when a catastrophic flood occurred that relators claim was caused by the spillway. Relators did not institute this action until 2009; thus, respondents argue, relators' claim is barred by the four-year limitations period of R.C. 2305.09(E).

{¶ 37} Nevertheless, in assessing respondents' statute-of-limitations claim, we note that R.C. 2305.09 contains a comparable four-year limitations period for "trespassing upon real property." R.C. 2305.09(A). In construing the statute of limitations for actions for trespass upon real property, we have held that if a trespass is continuing rather than a single completed act, the limitations period is tolled. *Sexton v. Mason*, 117 Ohio St.3d 275, 2008-Ohio-858, 883 N.E.2d 1013, ¶ 30-33; *Valley Ry. Co. v. Franz* (1885), 43 Ohio St. 623, 4 N.E. 88.

{¶ 38} In *Valley Ry.*, the railway company built a dam and an artificial channel on its own land to divert the river from its natural channel. This construction was completed in 1874. The diverted water damaged the plaintiff's land, and the plaintiff filed suit for trespass in 1881. We held that the case was not barred by the four-year statute of limitations, because of the continuing nature of the company's trespass:

{¶ 39} "[W]hen the owner of land rightly and lawfully does an act entirely on his own land, and by means of such act puts in action or directs a force against or upon, or that affects, another's land, without such other's consent or permission, such owner and actor is liable to such other for the damages thereby so caused the latter, and at once a cause of action accrues for such damages; and such force, if so continued, is continued by the act of such owner and actor, and it may be regarded as a continuing trespass or nuisance; and each additional damage thereby caused is caused by him, and is an additional cause of action; and, until such continued trespass or nuisance by adverse use ripens into and becomes a presumptive right and estate in the former, the latter may bring his action." Id. at 627.

{¶ 40} Although the railway company's actions in diverting the river ended in 1874, the company's continued control over the diverted channel resulted in a continuing trespass that tolled the four-year statute of limitations:

{¶ 41} "The company remained upon its own land, and cut the new channel, and took control of the stream, and directed its course when the same passed from its land and its control, and has ever since so controlled and directed the stream that has caused the damage complained of. The amended petition states a cause of action that is not barred by the statute of limitations provided for such cases." Id., 43 Ohio St. at 628, 4 N.E. 88.

{¶ 42} Similarly, in *State v. Swartz* (2000), 88 Ohio St.3d 131, 723 N.E.2d 1084, the defendant was charged with creating a nuisance by erecting a bridge and culvert on his property, which allegedly caused a backup of water and ponding on a neighbor's property with each heavy water flow. The structures constituting the nuisance were completed in 1992, and prosecution was not commenced until 1998. Nevertheless, we held that the two-year limitations period had not expired, because the alleged nuisance remained within the control of the defendant so as to constitute a continuing course of conduct:

**{¶ 43}** "Where one creates a nuisance as defined in R.C. 3767.13(C) and permits it to remain, so long as it remains, and is within the control of the actor, the nuisance constitutes a continuing course of conduct tolling the limitations period pursuant to R.C. 2901.13(D)." Id. at syllabus.

**{¶ 44}** Finally, in *Sexton*, 117 Ohio St.3d 275, 2008-Ohio-858, 883 N.E.2d 1013, we applied *Valley Ry.*, 43 Ohio St. 623, 4 N.E. 88, and *Swartz* and held that the "defendant's ongoing conduct or retention of control is the key" to distinguishing a continuing trespass, which tolls a statute of limitations, from a permanent trespass, which does not. Id. at ¶ 45. "We hold that a continuing trespass in this context occurs when there is some continuing or ongoing allegedly tortious activity attributable to the defendant. A permanent trespass occurs when the defendant's allegedly tortious act has been fully accomplished." Id. The defendants in *Sexton* had finished their work on the subdivision development and had ceded control by 1995. Because the neighboring homeowners did not bring suit until 2003, well after the four-year statute of limitations had expired, their trespass claim was barred.

**{¶ 45}** *Sexton*, *Valley Ry.*, and *Swartz* lead inexorably to the conclusion that when an act carried out on the actor's own land causes continuing damage to another's property and the actor's conduct or retention of control is of a continuing nature, the statute of limitations is tolled. There is no logical rationale for refusing to apply this rule to takings cases and R.C. 2305.09(E). Otherwise, a person whose property is damaged by flooding caused by another's actions might have a cause of action against a private person or entity but not against a governmental entity. Here, respondents constructed the new spillway in 1997 and continued to exercise control over both the spillway and the lake level by making decisions not to draw down the water either annually or before heavy rains. Therefore, based on this court's precedent, relators' mandamus claim is not barred

by the four-year statute of limitations in R.C. 2305.09(E), because respondents' ongoing control has tolled the running of the limitations period.

{¶ 46} In fact, in their merit brief, respondents do not even attempt to distinguish or otherwise argue the inapplicability of these cases. Instead, respondents rely on *Nickoli*, 124 Ohio St.3d 449, 2010-Ohio-606, 923 N.E.2d 588, and *Painesville Mini Storage, Inc. v. Painesville*, 124 Ohio St.3d 504, 2010-Ohio-920, 924 N.E.2d 357, in support of their argument that the four-year limitations period in R.C. 2305.09(E) was not tolled. These cases, however, are manifestly distinguishable. In *Nickoli*, the act constituting the taking—the construction and opening of a recreational trail—occurred on the relators' property rather than on the respondents' property. Unlike the relators here, the relators in *Nickoli* thus had direct and immediate notice of any alleged taking as well as the cause of the taking. In *Painesville*, the contested action was the city's issuance of a building permit for construction that, relator argued, interfered with its use of its own property. Unlike the alleged taking by ODNR and its director here, the city in *Painesville* did not retain control. And as with the relators in *Nickoli*, the relator in *Painesville* had direct and immediate notice of any alleged taking of its easement and right of access, as well as the cause of the taking.

{¶ 47} By contrast, this case arises from facts that are similar to those in *Swartz* and *Valley Ry.*, where defendants had allegedly engaged in conduct on their own property that caused flooding or water damage to adjoining landowners' property, and the defendants had retained control over their property.

{¶ 48} Moreover, as we observed in *Nickoli* at ¶ 34, quoting *Hopland Band of Pomo Indians v. United States* (Fed.Cir.1988), 855 F.2d 1573, 1577, a cause of action against the government does not accrue until " 'all the events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence.' (Emphasis omitted.)" See also *United States v. Dickinson* (1947), 331 U.S. 745, 749, 67 S.Ct. 1382, 91 L.Ed. 1789

("when the Government chooses not to condemn land but to bring about a taking by a continuing process of physical events, the owner is not required to resort either to piecemeal or to premature litigation to ascertain the just compensation for what is really 'taken' ").

{¶ 49} Respondents' expert, Stantec, stated that "[s]tandard engineering practice calls for at least 10 and preferably 15 years or more of record in order to produce meaningful hydrologic statistics."

{¶ 50} Consequently, even assuming that respondents are correct that all the events that fixed their liability to downstream landowners like relators were completed in 1997, when the new spillway was built, their mandamus action in 2009 was still filed within the four-year period of R.C. 2305.09(E). The ten to 15 years necessary to gather data to prove a taking had not yet passed. Relators needed time to determine whether the flooding that followed respondents' construction of the spillway in 1997 and their refusal to lower the lake level at GLSM was of sufficient frequency to constitute a taking.

{¶ 51} Therefore, the R.C. 2305.09(E) statute of limitations does not bar relators' takings claim.

*Mandamus: General Considerations*

{¶ 52} "The United States and Ohio Constitutions guarantee that private property shall not be taken for public use without just compensation." *State ex rel. Shemo v. Mayfield Hts.* (2002), 95 Ohio St.3d 59, 63, 765 N.E.2d 345, judgment modified in part on other grounds, 96 Ohio St.3d 379, 2002-Ohio-4905, 775 N.E.2d 493; Fifth and Fourteenth Amendments to the United States Constitution; Section 19, Article I, Ohio Constitution. The right of property is a fundamental right, and "[t]here can be no doubt that the bundle of venerable rights associated with property is strongly protected in the Ohio Constitution and must be trod upon lightly, no matter how great the weight of other forces." *Norwood v. Horney*, 110 Ohio St.3d 353, 2006-Ohio-3799, 853 N.E.2d 1115, ¶ 38.

**{¶ 53}** "Mandamus is the appropriate action to compel public authorities to institute appropriation proceedings where an involuntary taking of private property is alleged." *Shemo* at 63. To be entitled to the requested writ of mandamus, relators must establish a clear legal right to compel the respondents to commence an appropriation action, a corresponding clear legal duty on the part of respondents to institute that action, and the lack of an adequate remedy in the ordinary course of law. *State ex rel. Gilbert v. Cincinnati*, 125 Ohio St.3d 385, 2010-Ohio-1473, 928 N.E.2d 706, ¶ 15.

**{¶ 54}** The parties disagree over the appropriate burden of proof in this mandamus case. Relators argue that they need prove the required elements of mandamus only by a preponderance of the evidence, whereas respondents argue that the applicable standard is proof by clear and convincing evidence. A preponderance of the evidence is defined as that measure of proof that convinces the judge or jury that the existence of the fact sought to be proved is more likely than its nonexistence. See *Pang v. Minch* (1990), 53 Ohio St.3d 186, 197, 559 N.E.2d 1313. "Clear and convincing evidence is 'that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' " *State ex rel. Husted v. Brunner*, 123 Ohio St.3d 288, 2009-Ohio-5327, 915 N.E.2d 1215, ¶ 18, quoting *Cross v. Ledford* (1954), 161 Ohio St. 469, 53 O.O. 361, 120 N.E.2d 118, paragraph three of the syllabus.

**{¶ 55}** We have held that the appropriate standard of proof in mandamus cases is proof by clear and convincing evidence. In *State ex rel. Pressley v. Indus. Comm.* (1967), 11 Ohio St.2d 141, 161, 40 O.O.2d 141, 228 N.E.2d 631, we observed that in mandamus cases, " '[t]he facts submitted and the proof produced must be plain, clear, and convincing' " before a writ will be granted.

17

Id., quoting 35 Ohio Jurisprudence 2d (1959) 285, Section 37. And a few years later, in *State ex rel. Henslee v. Newman* (1972), 30 Ohio St.2d 324, 325, 59 O.O.2d 386, 285 N.E.2d 54, we held that the burden of proof on the relator in a mandamus case is to " 'demonstrate that there is plain, clear, and convincing evidence which would require the granting of the writ.' " Id., quoting the court of appeals' opinion.

{¶ 56} Parties seeking extraordinary relief bear a more substantial burden in establishing their entitlement to this relief. In mandamus cases, this heightened standard of proof is reflected by two of the required elements—a "clear" legal right to the requested extraordinary relief and a corresponding "clear" legal duty on the part of the respondents to provide it.

{¶ 57} Therefore, we reaffirm our holdings in *Pressley* and *Henslee* by specifying that relators in mandamus cases must prove their entitlement to the writ by clear and convincing evidence.

{¶ 58} Finally, relators seem to suggest that *Post* and *Case Leasing* are res judicata on relators' takings claim. We rejected a similar contention in *Nickoli*, 124 Ohio St.3d 449, 2010-Ohio-606, 923 N.E.2d 588. Relators are not in privity with the claimants in *Post* and *Case Leasing* merely because they own property in the same general area. Id. at ¶ 23-26. As to the evidence from those cases that has been submitted in this case, we will consider it to the extent that it is relevant to the takings claims of relators.

*Mandamus: Taking by Flooding*

{¶ 59} Relators' claim is based on a taking by flooding resulting from the state's public-improvement construction of a replacement spillway and its subsequent lake-level-management policies. "Any direct encroachment upon land, which subjects it to a public use that excludes or restricts the dominion and control of the owner over it, is a taking of his property, for which he is guaranteed a right of compensation by section 19 [Article I of the Ohio Constitution]."

*Norwood v. Sheen* (1933), 126 Ohio St. 482, 186 N.E. 102, paragraph one of the syllabus.

{¶ 60} In cases of flooding caused by actions of the government, we have held that "[t]he construction and operation of a municipal storm sewer system so as to cause material damage to a down-stream landowner, as a result of flooding from rains or other causes which are reasonably foreseeable, is a direct encroachment upon that land which subjects it to a public use that excludes or restricts the landowner's dominion and control over his land, and such owner has a right to compensation for the property taken under Section 19, Article I of the Ohio Constitution." *Masley v. Lorain* (1976), 48 Ohio St.2d 334, 2 O.O.3d 463, 358 N.E.2d 596, syllabus; see also *Lucas v. Carney* (1958), 167 Ohio St. 416, 5 O.O.2d 63, 149 N.E.2d 238 (construction on county property that increased the amount and force of surface water flowing onto landowners' property, causing frequent inundation, raised a claim of appropriation); *Gilbert*, 125 Ohio St.3d 385, 2010-Ohio-1473, 928 N.E.2d 706, ¶ 30-33 (evidence that city's pump station deposited sewage on at least 79 days between 1998 and 2008 in the creek that ran through landowners' property was sufficient to establish a physical taking).

{¶ 61} Our precedent is consistent with federal precedent. "[W]here the government by the construction of a dam or other public works so floods lands belonging to an individual as to substantially destroy their value there is a taking within the scope of the 5th Amendment." *United States v. Lynah* (1903), 188 U.S. 445, 470, 23 S.Ct. 349, 47 L.Ed. 539, overruled in part on other grounds, *United States v. Chicago, Milwaukee, St. Paul & Pacific RR. Co.* (1941), 312 U.S. 592, 598, 61 S.Ct. 772, 85 L.Ed. 1064. Even when the flooding is only occasional, a taking may result. See *United States v. Cress* (1917), 243 U.S. 316, 328, 37 S.Ct. 380, 61 L.Ed. 746 ("There is no difference of kind, but only of degree, between a permanent condition of continual overflow by backwater and a

permanent liability to intermittent but inevitably recurring overflows; and, on principle, the right to compensation must arise in the one case as in the other").

{¶ 62} Relators' mandamus action is one for inverse condemnation, which is "a cause of action against the government to recover the value of property taken by the government without formal exercise of the power of eminent domain." *Moden v. United States* (Fed.Cir.2005), 404 F.3d 1335, 1342.

{¶ 63} The United States Court of Appeals for the Federal Circuit, in a case involving a claimed taking by the government due to increased storm-water runoff caused by the construction of a post office, set forth the following two-part test for inverse-condemnation claims:

{¶ 64} "[N]ot every 'invasion' of private property resulting from government activity amounts to an appropriation. The line distinguishing potential physical takings from possible torts is drawn by a two-part inquiry. First, a property loss compensable as a taking only results when the government intends to invade a protected property interest or the asserted invasion is the 'direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action.' *Columbia Basin Orchard v. United States* (Ct.Cl.1955), 132 F.Supp. 707, 709 * * *. * * * Second, the nature and magnitude of the government action must be considered. Even where the effects of the government action are predictable, to constitute a taking, an invasion must appropriate a benefit to the government at the expense of the property owner, or at least preempt the owner's right to enjoy his property for an extended period of time, rather than merely inflict an injury that reduces its value." (Citations omitted in part.) *Ridge Line, Inc. v. United States* (Fed.Cir.2003), 346 F.3d 1346, 1355-1356.

{¶ 65} In eminent-domain cases involving claims of government-induced flooding, the claimant establishes a taking by proving that (1) the flooding is either intended by the government or is the direct, natural, or probable result of

government-authorized activity and (2) the flooding is either a permanent invasion or creates a permanent liability because of intermittent, but inevitably recurring, overflows. See generally *Cary v. United States* (Fed.Cir.2009), 552 F.3d 1373, 1377, 1380-1381; *Arkansas Game & Fish Comm. v. United States* (Fed.Cir.2011), 637 F.3d 1366, 1374-1375; *Ridge Line*, 346 F.3d at 1355, 1357.

**{¶ 66}** The first part of this test, which requires that the flooding is either intended by the government or is the direct, natural, or probable result of the government-authorized activity, is characterized as the causation prong. *Cary* at 1376-1377. There is some evidence here that respondents made an intentional choice to favor recreational users of the lake and south-side lakefront landowners over landowners and farmers on the western side of the lake. But there is no credible evidence that ODNR and its director intended to flood relators' land. In fact, it appears that the intent of respondents in constructing the new spillway was to prevent flooding—to prevent the dam at GLSM from failing and causing a catastrophic flooding event—and not to create or exacerbate it.

**{¶ 67}** Therefore, relators must establish that the flooding that occurred on relators' property was the direct, natural, or probable result of respondents' actions. See also *Barnes v. United States* (Ct.Cl.1976), 538 F.2d 865, 871 ("in cases such as these, plaintiffs need not allege or prove that defendant specifically intended to take property. There need be only a governmental act, the natural and probable consequences of which effect such an enduring invasion of plaintiffs' property as to satisfy all other elements of a compensable taking"). In essence, relators must prove both that respondents' actions caused the flooding and that the flooding was a foreseeable result of their actions. *Nicholson v. United States* (2007), 77 Fed.Cl. 605, 617.

**{¶ 68}** For the following reasons, relators have met their burden of proof with respect to the causation prong of the taking-by-flooding test.

**{¶ 69}** First, relators presented substantial, credible, and uncontroverted firsthand testimonial and documentary evidence that following respondents' construction of the new spillway in 1997 and its subsequent abandonment of lake-level management, their properties flooded more frequently, over a larger area, for longer duration, and with greater damage.

**{¶ 70}** Second, relators' primary expert, engineer Pressley L. Campbell, testified that the redesigned spillway caused frequent and severe flooding in the Beaver Creek-Wabash River area. This flooding would have been "highly unlikely, if not impossible" without the new spillway and respondents' subsequent failure to manage the lake level. Notwithstanding respondents' claims to the contrary, Campbell's conclusions were not based simply on his *Case Leasing* work. Other engineers in Campbell's company visited the properties and took photographs of the area, which Campbell reviewed.

**{¶ 71}** Third, the reliance of respondents and their expert on a 1981 United States Army Corps of Engineers report to discount Campbell's expert opinion is misplaced. According to engineer James Moir, the current conditions differ substantially from those in existence when that report was completed. There are now no trees along Beaver Creek, and thus the creek has a much greater capacity to convey water than it had previously.

**{¶ 72}** Fourth, significantly, respondents' own expert, Stantec, concluded in its hydrologic and hydraulic analysis that for the 15-year rain event that respondents claim to be the applicable frequency for a takings analysis, ten of relators' parcels suffered increased maximum depth and duration of flooding, and 46 of their parcels experienced increased duration of flooding since the redesign of the spillway and the abandonment of lake-level management. That is, even Stantec concedes that flooding of at least some of relators' property was caused by the new spillway and the lack of lake-level management.

{¶ 73} Fifth, Stantec also concluded that the peak flow from the new spillway in even ten-year rain events now exceeds the peak flow from historical 100-year rain events with the old spillway. For a 96-hour ten-year rain event with the new spillway, Stantec determined that the peak spillway flow was 650 cubic feet per second ("cfs"), which exceeds the 345 cfs peak spillway flow for a 96-hour 100-year rain event with the old spillway. According to the stipulations that ODNR agreed to in *Case Leasing*, Beaver Creek has a capacity of approximately 480 to 500 cfs, meaning that if the water discharged into the creek exceeds this capacity, Beaver Creek will overtop its banks. Therefore, based on respondents' own expert's analysis, since the 1997 construction of the new spillway and their cessation of lake-level management for GLSM, flooding in excess of prior 100-year rain events is occurring on at least a ten-year frequency, with the banks of the Beaver Creek overtopping enough to create the inevitably recurring flooding downstream that all the relators testified to experiencing.

{¶ 74} Finally, the flooding caused by respondents' new spillway and lake-level-management practices was foreseeable. ODNR was warned repeatedly by landowners, the Mercer County Engineer, and public officials about the likelihood of greater flooding. As the county engineer concluded, ODNR made a conscious choice to disregard that foreseeable risk in favor of recreational users of the lake and landowners on the southern end of the lake.

{¶ 75} ODNR and its director argue that relators have not met their burden of proof because they have not provided the requisite expert evidence on the issue of causation. Respondents maintain that relators' experts "made no effort to scientifically evaluate the impacts of the new spillway on individual Relator properties." Thus, relators have presented only lay evidence, which is insufficient to establish that the flooding was caused by governmental action.

{¶ 76} Even assuming that respondents have correctly characterized the relators' expert evidence as deficient on causation, we reject respondents'

23

argument that relators have failed to sustain their burden on that issue. It is true that "[t]he determination of causation in flooding cases is particularly difficult," *Mildenberger v. United States* (2010), 91 Fed.Cl. 217, 260, and that in certain circumstances, lay testimony is insufficient, and expert testimony is required. See generally *Alost v. United States* (2006), 73 Fed.Cl. 480, 495, and 496, fn. 14; see also *Cox v. Tennessee Valley Auth.* (C.A.6, 1993), 989 F.2d 499, 1993 WL 72488, *4 (unpublished disposition). Nevertheless, expert evidence is not always required to prove causation. *Moore v. Associated Material & Supply Co., Inc.* (1997), 263 Kan. 226, 242, 948 P.2d 652 (causation of flooding can be proved by lay testimony).

{¶ 77} In fact, even in cases holding that lay testimony is insufficient to establish causation in a takings case involving flooding, the holdings appear to be limited to the specific circumstances therein. For example, in *Alost*, the United States Court of Federal Claims emphasized that "the only evidence the plaintiffs presented with regard to the cause of the overflow flooding on their land was lay testimony," that half of the plaintiffs had owned their land for only one or two years before the government river-regulation project, and that the federal government provided *uncontroverted expert* testimony that the project did not cause the flooding of the plaintiffs' property. Id. at 495-496. This case is manifestly distinguishable from *Alost* because (1) relators introduced lay testimony and documentary evidence that was not merely conclusory, (2) some of the relators have been lifelong residents and farmers of the relevant property, (3) relators also submitted expert evidence, and (4) respondents' own evidence supports a finding that flooding of at least some of relators' property was caused by respondents' actions. See also *Tarrant Reg. Water Dist. v. Gragg* (Tex.App.2001), 43 S.W.3d 609, 618 ("Credible lay testimony is relevant to causation" in flooding cases).

**{¶ 78}** As the court of appeals held in *Post*, 2006-Ohio-6339, 2006 WL 3477024, at ¶ 66, relators' own testimony, "although not expert testimony, supports the hypothetical analysis that flooding will increase because of the new spillway. [The landowners] were not required to prove that every increased flooding event they had experienced was solely caused by the change in the spillway design."

**{¶ 79}** Therefore, relators have satisfied the first part of the two-part test for establishing a taking of their property by flooding caused by respondents. They proved by the requisite clear and convincing evidence that flooding that occurred on their property was the direct, natural, or probable result of respondents' actions. *Ridge Line,* 346 F.3d at 1355.

**{¶ 80}** For the second part of the test, referred to as the appropriation prong, the nature and magnitude of the government action are considered. Id. at 1356; *Cary*, 552 F.3d at 1380. This part requires an analysis of whether respondents' interference with relators' property rights "was substantial and frequent enough to rise to the level of a taking." *Ridge Line* at 1357. "Generally speaking, property may be taken by the invasion of water where subjected to intermittent, but inevitably recurring, inundation due to authorized Government action." *Lenoir v. Porters Creek Watershed Dist.* (C.A.6, 1978), 586 F.2d 1081, 1094. "The cases disclose the rule that the permanent, intermittent flooding which amounts to a taking must be frequent * * *." Id.; *Alost*, 73 Fed.Cl. at 495 ("A plaintiff seeking to establish a government taking of an easement by flooding must demonstrate * * * that the flooding is intermittent, frequent, and inevitably recurring"); *Fromme v. United States* (Ct.Cl.1969), 412 F.2d 1192, 1196 ("In a situation where works constructed by the Government on land owned or controlled by it cause the land of another to be subject to intermittent, frequent, and inevitably recurring floodings—although not to constant flooding—it is held

that the Government thereby takes a flowage easement over the affected land and must pay just compensation under the Constitution for the easement").

{¶ 81} "There is no absolute rule regarding the magnitude or duration of flooding necessary to constitute a taking." 2A Nichols on Eminent Domain (3d Ed.2010), Section 601[14][c][iii]; *Lea Co. v. North Carolina Bd. of Transp.* (1983), 308 N.C. 603, 620, 304 S.E.2d 164 ("a mechanical approach should not be taken with regard to the frequency of flooding required to constitute a taking"). A landowner is "not entitled to recover for a Fifth Amendment taking where the intermittent flooding of his land was not increased in elevation, frequency, and duration as a result of the government's project." *Bistline v. United States* (Ct.Cl.1981), 640 F.2d 1270, 1275; *Alost* at 495.

{¶ 82} Relators have also established by the requisite clear and convincing evidence that the flooding of their property, while intermittent, is inevitably recurring. As discussed previously, they testified concerning the frequency of the flooding, which many have experienced on a yearly basis, including in 2011. Moreover, Stantec's own expert report established that respondents' actions regarding the spillway and lake-level management are now causing 100-year flooding events every ten years. And according to the evidence submitted by some of the relators, flooding can now occur after even a minimal rain event.

{¶ 83} Based on the foregoing, relators have established that respondents, by their actions, effected a taking of at least some of their property.

*Prescriptive Easement*

{¶ 84} Respondents argue that even should this court find a taking, the taking is not compensable, because ODNR had acquired a prescriptive easement to flood relators' property. Respondents waived this affirmative defense by failing to raise it before the parties proceeded to submit evidence and argument in this case. See generally *State ex rel. Plain Dealer Publishing Co. v. Cleveland* (1996), 75 Ohio St.3d 31, 33, 661 N.E.2d 187 ("An affirmative defense is waived

under Civ.R. 12(H), unless it is presented by motion before pleading pursuant to Civ.R. 12(B), affirmatively in a responsive pleading under Civ.R. 8(C), or by amendment under Civ.R. 15").

## Conclusion

{¶ 85} Based on the foregoing, this case is not barred by the four-year statute of limitations of R.C. 2305.09(E), and relators have established that respondents' construction of the spillway and concomitant refusal to lower the lake level at GLSM caused flooding with the requisite frequency to constitute a taking. As we recently noted, "[t]his court has a history of protecting property rights, and our decision today continues that long-standing precedent." *State ex rel. Merrill v. Ohio Dept. of Natural Resources*, 130 Ohio St.3d 30, 2011-Ohio-4612, 955 N.E.2d 935, ¶ 60. Respondents were free to determine that the old spillway needed to be replaced for the dam at GLSM to survive a probable maximum flood. And they were also authorized to determine that redesigning the spillway and abandoning lake-level management were the preferable ways to remedy the probable-maximum-flood problem and to appeal to both recreational users of the lake and homeowners on the southern shore of the lake. Once they made that decision, however, they were liable for the damage to downstream landowners caused by the intermittent, but inevitably recurring, flooding that resulted from the new western spillway.

{¶ 86} Therefore, we grant a writ of mandamus to compel respondents to commence appropriation proceedings to determine the amount of their taking of the property. *Shemo,* 95 Ohio St.3d at 69, 765 N.E.2d 345 (writ of mandamus granted to compel respondents to commence appropriation proceedings to determine the amount of the city's temporary taking of relators' property). The determination of the extent of the taking will be made by the court presiding over the appropriation proceeding. See R.C. 163.05 (requiring that a petition for

appropriation of property interests less than a fee be in sufficient detail "to permit a determination of the nature, extent, and effect of the taking").

Writ granted.

O'CONNOR, C.J., and PFEIFER, LUNDBERG STRATTON, O'DONNELL, LANZINGER, and BELFANCE, JJ., concur.

EVE V. BELFANCE, J., of the Ninth Appellate District, sitting for CUPP, J.

_____

Vorys, Sater, Seymour & Pease, L.L.P., Bruce L. Ingram, Joseph R. Miller, Thomas H. Fusonie, and Martha C. Brewer, for relators.

Michael DeWine, Attorney General, and William J. Cole, Mindy Worley, Jennifer S.M. Croskey, Dale T. Vitale, Daniel J. Martin, and Tara L. Paciorek, Assistant Attorneys General, for respondents.

Larry R. Gearhardt and Chad A. Endsley, urging granting of the writ for amicus curiae, Ohio Farm Bureau Federation.

_____