[Cite as *State v. Lang*, 2024-Ohio-3157.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## WYANDOT COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

    v.

AMBER L. LANG,

    DEFENDANT-APPELLANT.

CASE NO. 16-23-10

O P I N I O N

Appeal from Wyandot County Common Pleas Court
Trial Court No. 22-CR-0125

Judgment Affirmed

Date of Decision: August 19, 2024

APPEARANCES:

    *Howard A. Elliott* for Appellant

    *Alicia A. Lentz-Conley* for Appellee

**MILLER, J.**

{**¶1**} Defendant-Appellant, Amber L. Lang ("Lang"), appeals the December 21, 2023 judgment issued by the Wyandot County Court of Common Pleas following her guilty plea. This appeal concerns whether the trial court properly computed the amount of restitution arising from Lang's theft conviction. Lang claims that at least some of the restitution awarded includes amounts for offenses she did not commit and includes amounts for which the victim was separately reimbursed by a third party. For the reasons that follow, we affirm.

## I.     FACTS AND PROCEDURAL HISTORY

### A.     Indictment, Plea, and Sentence

{**¶2**} On November 9, 2022, Lang was indicted for theft, in violation of R.C. 2913.02(A)(1). The Indictment charged that, on or about June and July of 2022, Lang deprived Ridi's Convenience Stores ("Ridi's") of lottery tickets with a value in an amount greater than $7,500 but less than $150,000, without Ridi's consent. Given the alleged value, the charged offense was a fourth-degree felony.

{**¶3**} Lang subsequently pleaded guilty to the offense. The trial court sentenced Lang to serve three years of community control, serve 45 days in jail, and pay restitution to Ridi's in an amount to be determined after a hearing. The restitution hearing took place on August 18 and November 28, 2023.

### B.     Evidence Presented at the Restitution Hearing

{¶4} Lang worked for Ridi's, which owns several convenience stores. She was the district manager in charge of the store at the Carey, Ohio location—which is where the theft occurred. Among her other duties, Lang was responsible for "handling the lottery," i.e., overseeing the lottery reconciliation at the store. (Hearing Tr. at 139-144).

{¶5} Importantly, the lottery tickets at issue in this case were scratch-off tickets. Witnesses explained that, in the usual course of business, the Ohio Lottery Commission ("Commission") sends a pack of lottery tickets to a store; the store makes the lottery tickets available for purchase to customers; a purchased ticket is rung up and activated, and the store collects the ticket's purchase price—which is printed on the ticket's face; and, the store is charged by the Commission for the pack of lottery tickets once the last ticket in the pack is sold. Thus, at the time the last ticket in a pack is sold, the number of tickets a store purchased should correspond with the number of tickets the store sold.

{¶6} The Commission has a point-of-sale (POS) system that tracks all ticket sales and activated tickets electronically, thereby relieving the store of having to inform the Commission of its sales. Using its POS system, the Commission generates and sends out weekly invoices showing a store's sales and pay-outs (for winnings). Thus, the weekly invoices showed Ridi's what its sales were at the store

on a weekly basis and how much money the Commission would take out of Ridi's bank account for payment.

{¶7} Bonnie Ignat ("Ignat") was the controller and accountant for Ridi's. She had a bachelor's degree in accounting and 25 years of experience working at a certified public accountant firm. Ignat explained that she recorded all lottery sales and winnings based on what was entered in the store's own POS system, which was separate from the Commission's POS system.

{¶8} Ignat realized something was wrong when she discovered that Ridi's bank account had a negative balance because the Commission had pulled out more money than the account contained, i.e., it overdrew the account. Upon reviewing the store's records, the recorded lottery ticket sales were insufficient to justify the amount of money the Commission had withdrawn from the account. The store's owner testified that, upon questioning Lang about the discrepancy between the two POS systems, Lang admitted to stealing lottery tickets.

{¶9} The police got involved, with Charles Seeley of the Upper Sandusky Police Department ("Detective Seeley") leading the investigation. During Detective Seeley's interview of Lang, she did not deny stealing lottery tickets. According to Detective Seeley, he confronted her about playing 53 lottery tickets a day during the height of her theft, asked if that would surprise her, and she said "no." Lang told him "that she had been going through a lot of life issues and that she had started . . . taking lottery tickets and scratching them as a way of relieving her stress and

anxiety." (Hearing Tr. at 9). Lang said that things in her life had recently gotten worse, and she started taking more and more lottery tickets in the past couple of months.

{¶10} In her interview with Detective Seeley, Lang denied there was anyone else involved in the theft. Although Lang said two other people were present when she scratched off some of the tickets, she did not know if they would have understood whether the tickets had been paid for or stolen. Based on Detective Seeley's investigation, there was nothing to indicate anyone else was involved in the theft.

{¶11} At the request of Ridi's owner, Ignat conducted a formal accounting of profits and losses for the store's lottery sales. Using accounting software, she compared the sales numbers from the store's POS system to the Commission's invoices for the bank withdrawals—which indicated what the Commission maintained the store had sold. Ignat also created a spreadsheet that showed a side-by-side comparison of the store's numbers with the Commission's numbers. The spreadsheet covered the time period from the beginning of January 2022 through the end of July 2022. Although what the store collected and sold should have matched what the Commission said the store collected and sold, Ignat said that was not the case. The discrepancies between the two significantly increased in June and July of 2022. Ignat subtracted the difference between the Commission's numbers and the store's numbers to come up with a figure for the store's loss. Based on her

analysis and accounting, the amount Ignat deemed attributable to the theft of lottery tickets was approximately $117,000.[1]

{¶12} Ignat testified that Ridi's had paid that entire amount to the Commission. Doing so required Ridi's to move money into its deficient bank account from other sources. Ridi's and Detective Seeley also contacted the Commission for information regarding the amount of winnings paid out. Ticket sales are distinguishable from winnings distributed for a winning ticket. Stores are reimbursed by the Commission for *winnings* that a store provides to a customer with a winning ticket, but not for the purchase price of a ticket. Ignat explained that the Commission had "compensated [the store] for any winnings, winning ticket that was turned in," but the store was "not compensated for the cost of the original ticket that was not purchased because it was stolen." (Hearing Tr. at 57). Ignat clarified that the $117,000 figure was the cost to Ridi's of the stolen tickets; that figure did not include any winnings reimbursed by the Commission to Ridi's.

{¶13} The following exchange took place during Ignat's testimony regarding the spreadsheet she made:

> Q:      … How much of this spreadsheet can you attribute to Amber Lang based on your accounting?
>
> A:      Based on my accounting, all I can attribute is that we lost 117,000. As to who took that money, I cannot

---

[1] Among other exhibits admitted during the hearing were the profit-and-loss statement, the spreadsheet, and a statement of weekly invoices from the Commission from January 2022 through July 2022.

> account for that. . . . All I know is that is what we are missing.
>
> Q: And do you -- is it your testimony that that missing amount is due to theft?
>
> A: Yes.
>
> Q: Okay. And how do you know that?
>
> A: Because if it wasn't theft, I would have the cash in the bank account.
>
> Q: And I just want to be clear on this. You were compensated for winnings?
>
> A: Yes.
>
> Q: Not the cost of tickets?
>
> A: Correct.

(*Id.* at 74). Ignat further explained: "[I]f the tickets were actually sold, [Ridi's] would have collected the money and [Ridi's] would have had the money in hand to pay the lottery" and its "bank account would not have come up negative week after week." (*Id.* at 60).

{¶14} Ignat also explained how Lang could have committed the theft: the Commission will not "pay out a winning ticket if [it] can't say that this winning ticket was purchased," so after she scratched off the ticket, Lang "had to have scanned the [winning] lottery tickets saying that they were sold with the lottery," but "[s]he just did not put the cash in [the store's] register and if [it was] a losing ticket, she threw it away." (*Id.* at 77). On cross-examination, Ignat admitted it was possible some of the discrepancy between the store's and the Commission's sales

numbers could be from an accounting error or from an employee forgetting to scan a ticket.

**{¶15}** Lang testified in her defense. She said she never took any money from Ridi's except for winnings from the tickets she played. She also did not believe any of the money "missing in this case" was "winnings from when [she] played" the lottery at the store. (Hearing Tr. at 149). According to Lang, her coworkers knew what she was doing, all of them played the lottery while working at the store, and they played the same way that she played. However, Lang did not identify the time frame in which her coworkers played the lottery, and she admitted she did not know whether they ever cashed out at the end of their shift because she was not there the entire time they played. Lang also admitted on cross-examination that she did not know how many lottery tickets she played on a daily basis, and she was unsure whether or not she played more than 50 tickets a day at the height of the theft.

**{¶16}** Lang called one of her former co-workers, Brandy Rochester ("Rochester"), to testify. Rochester acknowledged that she and all other employees played the lottery while working at the store. However, like Lang, she did not identify the time frame in which they played the lottery. In fact, she admitted that she did not know when she and Lang started playing the lottery together at work, and she volunteered that she is "not good with time frames." (*Id.* at 172). Notably, the following exchange occurred during Rochester's testimony:

Q:      … [Y]ou always paid for your tickets?

A:      Yes.

Q:      Okay.  So there was never any money missing --

A:      No.

Q:      -- from your playing lottery?

A:      No.

Q:      And same for Amber as well?

A:      As far as I know.  What I seen was it was always taken care of.

Q:      Okay.  All right.  But you knew that there was some money missing as far as the lottery system was concerned?

A:      When it came to the computer and things being off in the computer, it was just numbers.  I didn't realize – I don't know, I'm kind of dumb like that, but I didn't realize that it was actually money.

. . .

Q:      [Y]ou said that everyone played [the lottery while working at the store].  Was, uh -- Did management know about this?  Did the owners know about this?

A:      Not to my knowledge.

Q:      But it wasn't hidden from management, was it?

A:      No.

Q:      No.  And, um, you said at the time you didn't really know it was wrong?

A:      I didn't know it was illegal to do that.

Q:		Okay.

A:		I mean cause what I seen, it was paid for.

(*Id.* at 170-171, 177).

{¶17} Detective Seeley testified in rebuttal that he had explored whether or not there were any other suspects. Ridi's did not provide him with any other suspects, and Lang had denied anyone else was knowingly involved.

## C.    Restitution Order

{¶18} In its judgment entry following the restitution hearing, the trial court made the following findings and conclusions concerning restitution:

> The Court has considered the testimony and review of the Exhibits and has heard the arguments of Counsel as to the issue of restitution. . . .
>
> After reviewing all of the evidence, the Court finds a couple pieces of evidence compelling. One was the testimony of one of the owners of the store indicating the great amount of losses were rather late during the period. This is confirmed by the lottery analysis of the Carey store that has a review of everything for 2022 beginning the week of January 8, 2022. Looking at the pattern during that time, figures were fairly consistent all along. . . .
>
> Before the week ending May 21, 2022, there was an average loss of about $317.00 a week, which is somewhat consistent with what one of the owners advised that they would not always balance out, and that there would be some sort of differences from week to week.
>
> . . . Starting [the week ending May 21, 2022], the losses bec[a]me much larger and consistent. There were no surpluses after that. It greatly increased to more than $10,000.00 a week, beginning in July.
>
> All things considered, that is where the clear theft occurred. The Court is going to base the restitution on the figures from May 21, 2022 through the end of July 2022. When those losses are added up for

those weeks, that totals $106,013.00. [In comparison,] [t]he total losses for [all of] 2022 [were] $112,029.00. . . .

From the $106,013.00, the Court deducted the average loss from preceding weeks of $317.00 per week, which results in a total reduction in the amount of $3,483.00.

As a result, the Court finds that restitution is owed in the amount of $102,530.00 . . .

(Dec. 21, 2023 Judgment Entry at 6-7). This appeal followed.

## II. ASSIGNMENT OF ERROR

Lang raises a single assignment of error for our review:

**Assignment of Error**

**The trial court abused its discretion and committed reversible error in failing [sic], as for order of restitution that it was not supported by substantial and credible evidence, and did not indicate the actual economic loss that was directly and proximately related to the criminal activity of the Defendant/Appellant.**

## III. DISCUSSION

{¶19} In the assignment of error, Lang argues the trial court did not properly compute the amount of restitution arising out of her conviction for theft. She specifically argues that "the court ordered restitution for offenses she did not commit or alternatively made her responsible for the losses that apparently can be attributable to everyone else in the store who is playing the lottery." (Appellant's Brief at 12). She asserts that doing so did not comport with legal standards for imposing restitution and violated her due process rights. She asks that we reverse the order for restitution and remand the matter to the trial court with instructions to

impose restitution in the amount of $7,500, i.e., the minimum in the range for fourth-degree felony theft.

### A. Standard of Review

{¶20} "We review a trial court's order of restitution for an abuse of discretion." *State v. Dingledine*, 2023-Ohio-4256, ¶ 7 (3d Dist.). A trial court abuses its discretion when its conduct is unreasonable, arbitrary, or unconscionable. *State v. Hill*, 2022-Ohio-4544, ¶ 9. A decision is arbitrary if it is made without consideration of, or regard for, facts or circumstances. *Id*. A decision may also be arbitrary if it is without an adequate determining principle. *Id.*

### B. Applicable Law

{¶21} "Restitution in Ohio is limited to economic losses suffered by the victim as a direct and proximate result of the commission of the offense." *State v. Yerkey*, 2022-Ohio-4298, ¶ 1. Specifically, the statute governing financial sanctions provides, in relevant part:

> (A) . . . [T]he court imposing a sentence upon an offender for a felony . . . shall sentence the offender to make restitution pursuant to this section and [R.C. 2929.281]. . . . Financial sanctions . . . include, but are not limited to, the following:
>
> > (1) Restitution by the offender to the victim of the offender's criminal offense or the victim's estate, in an amount based on the victim's economic loss. . . . At sentencing, the court shall determine the amount of restitution to be made by the offender. The victim, victim's representative, victim's attorney, if applicable, the prosecutor or the prosecutor's designee, and the offender may provide information relevant to the determination of the amount of restitution. The amount the court orders as

> restitution shall not exceed the amount of the economic loss suffered by the victim as a direct and proximate result of the commission of the offense. . . . The court shall hold a hearing on restitution if the offender, victim, victim's representative, or victim's estate disputes the amount. . . .

R.C. 2929.18(A)(1); *see also* R.C. 2929.281 (amount of restitution). "Economic loss" is defined as "any economic detriment suffered by a victim as a direct and proximate result of the commission of an offense." R.C. 2929.01(L); *see also* R.C. 2929.281(A) (non-exhaustive list of items that qualify as "economic loss"). In line with this law, restitution may be ordered only for those acts constituting the crime(s) for which the defendant was convicted. *State v. Miller*, 2009-Ohio-6157, ¶ 3 (3d Dist.); *see also State v. Rohrbaugh*, 2010-Ohio-6375, ¶ 17 (3d Dist.) ("[m]any Ohio courts, including this court, have recognized that restitution must be limited to the offenses for which a defendant is charged and convicted").

**{¶22}** "The court shall determine the amount of full restitution by a preponderance of the evidence." R.C. 2929.18(A)(1). "A preponderance of the evidence is defined as that measure of proof that convinces the judge or jury that the existence of the fact sought to be proved is more likely than its nonexistence." *State ex rel. Doner v. Zody*, 2011-Ohio-6117, ¶ 54. The type of evidence upon which the sentencing court may rely in determining the amount of restitution is broad. *E.g.*, *Miller* at ¶ 5; *State v. Halcomb*, 2013-Ohio-1301, ¶ 31 (3d Dist.) (affirming restitution amount where the prosecution presented competent, credible evidence, by way of testimony and exhibits, of the actual amount of loss suffered by the victim

as a result of defendant committing aggravated burglary). "The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact." *State v. Alexander*, 1999 WL 446432, *3 (3d Dist. June 30, 1999) (affirming amount of restitution ordered by trial court following restitution hearing).

### C.    Analysis

{¶23} Based on evidence presented during the hearing, and recited above, there was competent, credible evidence to support the trial court's finding that the restitution amount awarded was a direct and proximate result of Lang's theft. The trial court's methodology was reasonable, not arbitrary, and consistent with the evidence and time frame charged in the Indictment (to which Lang pleaded guilty). *See State v. Perkins*, 2019-Ohio-3993, ¶ 8, 11-12, 32 (11th Dist.) (affirming restitution amount stemming from theft of lottery tickets, where "the amount of restitution requested by the state is supported by competent, credible evidence in the form of [the] testimony" from the victim's part-owner and manager).

{¶24} Lang argues that "any incorporation of winnings on the tickets is not properly restitution." (Appellant's Brief at 11). However, the evidence did not indicate winnings paid out by Ridi's and reimbursed by the Commission were included in the restitution awarded. On the contrary, the evidence indicated that the reimbursements made by the Commission were specifically not included in the accounting made by Ignat that the trial court relied on in its decision. Moreover, if Lang had not stolen those winning scratch-off tickets, then they would have been

sold to paying customers; Ridi's would have paid out the winnings to those customers, and the Commission would have reimbursed Ridi's for those payments. In short, the amount of reimbursement from the Commission is different from the amount awarded in restitution for Ridi's losses caused by Lang's theft (i.e., the cost of the tickets).

{¶25} Finally, we do not agree with Lang that the trial court abused its discretion in ordering her "to pay restitution for damage arising from a crime of which [s]he was not convicted." *State v. Williams*, 2004-Ohio-2801, ¶ 23-24 (3d Dist.) (reversing restitution order where the trial court ordered defendant to pay the amount of two counterfeit checks, because he was only convicted of forgery for one of the checks). As an initial matter, the trial court was in the best position to judge the credibility of the witnesses, including Lang and Rochester, and was entitled to believe some, all, or none of their testimony. *State v. Borger*, 2023-Ohio-1124, ¶ 20-21 (1st Dist.) (affirming restitution amount that involved the trial court making a credibility determination). If anything, Rochester's testimony showed she and the other employees *did not* commit theft. Rochester said she always paid for her lottery tickets and, from what she saw, store employees paid for the tickets they played. Further, neither Lang nor Rochester indicated when Rochester and the other employees were playing the lottery, including whether it was during the relevant time period identified in the indictment and by the trial court for purposes of calculating the amount of restitution. *See Perkins*, 2019-Ohio-3993, at ¶ 8 (11th

-15-

Dist.) (affirming restitution amount despite victim being uncertain "who had access to the lottery machines during every instance when tickets were taken" and victim testifying some of the economic loss could be attributed to the malfunction of the lottery machine).

{¶26} We find that the trial court did not abuse its discretion in deciding a preponderance of the evidence established that Ridi's suffered an economic loss of $102,530.00 as a direct and proximate result of Lang's theft.

## IV. CONCLUSION

{¶27} For the foregoing reasons, Lang's assignment of error is overruled. Having found no error prejudicial to the appellant in the particulars assigned and argued, we affirm the judgment of the Wyandot County Court of Common Pleas.

***Judgment Affirmed.***

**WILLAMOWSKI, P.J. and ZIMMERMAN, J., concur.**

/jlm