[Cite as *State ex rel. Rohrs v. Germann*, 2013-Ohio-2497.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HENRY COUNTY

STATE OF OHIO, EX REL.
RICHARD ROHRS, ET AL.,

    PLAINTIFFS-APPELLANTS,           CASE NO. 7-12-21

    v.

RANDOLF GERMANN, ET AL.,          O P I N I O N

    DEFENDANTS-APPELLEES.

Appeal from Henry County Common Pleas Court
Trial Court No. 05CV103

**Judgment Affirmed**

Date of Decision: June 17, 2013

APPEARANCES:

    *David S. Pennington* **for Appellants**

    *Donald E. Theis* **for Appellees**

**SHAW, J.**

{¶1} Plaintiffs-appellants, Richard and Rodney Rohrs (the "Rohrs"), appeal the October 22, 2012 judgment of the Henry County Court of Common Pleas granting summary judgment in favor of defendants-appellees, the Henry County Engineer, Randolph Germann et al., (collectively referred to as the "County Engineer").

*Statement of the Facts*

{¶2} In the late 1990's, Gerald Westhoven approached the County Engineer about an open ditch on the east side of County Road 3 between U.S. 24 and County Road 3S in Washington Township. Westhoven wanted the ditch cleaned out to help alleviate the drainage and flooding problems he was experiencing in his field bordering County Road 3.

{¶3} The County Engineer completed an inspection of the ditch and the immediate surrounding area which showed "most or all of Mr. Westhoven's field tile to be below and under water in the ditch." The County Engineer determined that deepening and widening the ditch was not an available option from a safe engineering or a regulatory standpoint due to the close proximity of the ditch to County Road 3 and the amount of erosion detected in the ditch.[1]

---

[1] According to the County Engineer, there was only a foot of berm or shoulder between the road and the sloping of the ditch.

{¶4} In order to remedy both the drainage/flooding issues and to maintain road safety, the County Engineer devised a plan to install a new wide plastic drainage pipe in place of the open ditch and then fill the ditch. This course of action would also allow the berm to be widened and eliminate the "ditch fall-off" as a possible hazard to motorists. The project would not require the County Engineer to do any work beyond the County's established right of way on County Road 3.

{¶5} For economic reasons, the County Engineer decided to categorize the project as a "road safety improvement project." This meant that the project would be handled "in house" with the County Engineer incurring all the cost from his budget. Handling the project in this manner, rather than as a ditch petition project, also spared Westhoven and the other adjoining landowners from being assessed any fees and costs associated with the project. As the property owner with the largest amount of property in the project area, Westhoven would benefit the most from the County Engineer's decision to handle the project in this manner.

{¶6} In an affidavit filed as part of this litigation, the County Engineer summarized the planned execution of the project as follows:

> **The project plans called for any working field tile entering the ditch from the east to be tied in to the drainage pipe system that was replacing the ditch. All County metal corrugated crossover pipes coming from underneath County Road 3 from the west into the ditch were to be inspected—and those not closed or blocked but working and draining and still in use were also to be**

**connected to the new pipe system. Those County crossover culvert pipes determined to be no longer in use, filled with debris, dirt, etc. would be filled with LSM 50, a watery, slurry cement-like material. Taking this action prevents such pipe from becoming a potential impairment to the efficiency of the new drainage system and is good engineering practice for the safety of the traveling public as it precludes and prevents any road hazard that could result from the collapse of any such corrugated pipe.**

(Germann Affidavit at ¶ 6).

{¶7} The work done by the County Engineer at issue in this case occurred during the execution of Phase III in the fall of 2002. While in the process of carrying out Phase III, county employees, Rick Murray and Paul Walker, encountered a County metal crossover pipe which was marked as "unknown tile" on the County Engineer's plans. This particular pipe ran perpendicular to the neighboring Saul Farm field and ran approximately 45 feet south of Westhoven's field. Murray and Walker observed "sufficient debris" where the pipe emptied into the open ditch, which indicated a lack of drainage. Murray and Walker were aware that the Saul Farm had recently been retiled with the drainage of that field flowing west toward the river and away from County Road 3. Walker reported the situation regarding this crossover pipe to Ron Wentling, the County Engineer's surveyor, and the decision was made to not tie this crossover pipe into the new drainage system, but to fill it with LSM 50.

{¶8} As Murray and Walker's crew began the procedure of filling the crossover pipe with LSM 50 by digging down in the ditch to expose the pipe, they discovered a buried catch basin that was not on the plans. This catch basin also contained a fair amount of debris and berm material. Both the crossover pipe and the catch basin were filled with LSM 50.

{¶9} In the following May of 2003, the Plaintiffs in this case, the Rohrs, entered into a one-year lease with Westhoven to rent his 81 acre field bordering County Road 3 for $275.00 per acre. Prior to signing the lease, the Rohrs were assured that the field was tiled and had adequate drainage to plant a tomato crop as they intended. The assurance of proper drainage was factored into the lease price. (*See* Richard Rohrs Affidavit).

{¶10} In July 2003, the Rohrs began experiencing drainage and flooding issues in the southeast corner of the Westhoven field. The Rohrs were aware that the County Engineer had recently completed a project in the vicinity of the flooding and contacted the County Engineer. The County Engineer arrived at the property and observed one to five acres with standing water.

{¶11} After the 2003 harvest, the County Engineer worked with Westhoven to locate a drainage exit or a field tile in this area of Westhoven's field. According to the County Engineer, "Westhoven did not know where the tile came out of this field, where in the field there was tile, and he was not sure which way the field

drained." (Germann Affidavit at ¶ 14). At Westhoven's direction and with his approval, the County Engineer attempted to locate the field tile in the area with poor drainage, which included trenching 40-50 feet into the Saul Farm/Westhoven fields along the boundary line and digging in areas where Westhoven told the County Engineer to dig. Despite these efforts, no field tile was found.

{¶12} The County Engineer, at its own cost, installed a new catch basin with an open grate for surface water drainage on the west side of County Road 3 near the southeast corner of Westhoven's field. The County Engineer also installed a new crossover pipe underneath County Road 3 to connect this catch basin to the drainage pipe system installed in the fall of 2002. These improvements were made so that a connecting tile could be eventually run from the Westhoven field to this new catch basin if and when any field tile is found or the field is retiled and is drained toward County Road 3.[2]

{¶13} At this time, the County Engineer also noticed that the top of the catch basin located at the northeast end of the Westhoven field had been damaged due to farm machinery running over it when entering and exiting the field. The County Engineer fixed and reinforced the catch basin so that it could properly drain surface water runoff and made it less susceptible to damage by farm machinery.

---

[2] The record indicates that Westhoven subsequently had the farm tile in his field rerouted to this new catch basin to provide for subsurface draining of his field.

{¶14} The Rohrs verbally renewed their one-year lease with Westhoven through 2006 and planted soybeans and popcorn.

{¶15} In March of 2007, the Rohrs hired an independent engineering firm to perform an excavation on the south end of the Westhoven property. The County Engineer and his employees were also present. During the excavation, a functioning field tile was located approximately 15 feet northwest of the catch basin filled with LSM 50 by county employees during completion of the 2002 project. A seed bag was also found stuffed into the field tile at the interface with the catch basin. The catch basin was alleged to be the only outlet for this field tile. Murray and Walker, the county employees who worked on the project in 2002, denied that they intentionally placed the seed bag into the field tile and provided the following explanation:

> **The most likely explanation for finding and pulling out a seed bag among the debris pulled out of this catch basin during the recent excavation from my vantage point and experience is that the bag was used to make sure as much as the LSM 50 went where it was supposed to go—into the crossover pipe—with a minimum of waste. The bag would have been placed on top of the debris in the catch basin as a combination funnel/effective plastic barrier, so that all of the LSM 50 would flow down and into the crossover pipe and not seep down into the debris or catch basin. Once done with filling the crossover pipe with LSM 50, the bag was simply left in the catch basin since it would not be going anywhere in any event, but remained buried in the catch basin.**

(Walker Affidavit at ¶ 8, Murray Affidavit at ¶ 9).

{¶16} Murray and Walker also stated in affidavits that if Westhoven or anyone else had reported the existence of this field tile or had it been found, the crossover pipe and catch basin would not have been filled with LSM 50.

### *Statement of the Case*

{¶17} On August 1, 2005, the Rohrs initiated this action against the County Engineer by alleging that the work performed during the fall of 2002 caused poor drainage of surface water on the property they leased from Westhoven. The Rohrs claimed that they sustained major losses to their tomato crop in 2003 and suffered in excess of $70,500.00 in damages as a result of the drainage problems. The Rohrs twice amended their complaint to include as defendants the Henry County Commissioners and several county employees who assisted in the project. The Rohrs also expanded their initial complaint to include several additional causes of action, including various state tort claims, federal claims based on deprivation of their substantive and procedural due process rights under 42 U.S.C. § 1983, and a motion for an issuance of a writ of mandamus to compel the County Engineer to initiate appropriation proceedings.

{¶18} On April 23, 2007, defense counsel filed two motions for summary judgment. The first motion alleged that five of the county employees named as defendants were entitled to summary judgment as a matter of law because they had no involvement in the 2002 project. The second motion for summary

judgment maintained that the County Engineer and the remaining defendants were entitled to judgment as a matter of law because the Rohrs' state tort claims were barred by governmental immunity set forth in Chapter 2744, and the Rohrs lacked standing to bring their federal constitutional claims or to seek a writ of mandamus.

{¶19} On February 28, 2012, after a hearing, the trial court ruled on the defendants' motions for summary judgment. The trial court granted the first motion for summary judgment finding that the five county employees lacked any actionable involvement in the 2002 project and dismissed them as parties from the suit. The trial court granted in part the defendants' second motion for summary judgment against the County Engineer and the remaining defendants. Specifically, as it relates to the issues raised in this appeal, the trial court found that the defendants were entitled to governmental immunity under Chapter 2744. The trial court also found that the Rohrs failed to prove that they suffered a deprivation of their substantive and/or procedural due process rights under the federal constitution.

{¶20} However, the trial court also found that a genuine issue of material fact remained as to whether the Rohrs were entitled to a writ of mandamus to compel the County Engineer to initiate appropriation proceedings. Accordingly, the trial court denied the defendants' motion for summary judgment on this ground.

{¶21} On August 8, 2012, the County Engineer and the remaining defendants in the suit filed another motion for summary judgment arguing that the Rohrs lacked standing to bring a mandamus action.

{¶22} On October 4, 2012, the trial court filed an opinion granting the defendants' motion for summary judgment on the mandamus issue.[3] The Rohrs subsequently filed a motion for reconsideration, which was overruled by the trial court. The trial court then issued its October 22, 2012 Judgment Entry journalizing its decision.

{¶23} The Rohrs now appeal asserting the following assignments of error.

### ASSIGNMENT OF ERROR NO. I

**THE TRIAL COURT ERRED WHEN IT CONCLUDED THAT SOVEREIGN IMMUNITY EXTENDED TO A NON-DISCRETIONARY REQUIREMENT TO "FIELD TAP ALL EXIST[ING] FIELD TILE" SET OUT IN THE ENGINEERING PLANS FOR THE ROAD PROJECT.**

### ASSIGNMENT OF ERROR NO. II

**THE TRIAL COURT ERRED WHEN IT DENIED PLAINTIFFS' MOTION FOR ISSUANCE OF A WRIT OF MANDAMUS FOLLOWING ITS DETERMINATION THAT PLAINTIFFS HAD NO REMEDY IN THE ORDINARY COURSE OF LAW BY REASON OF SOVEREIGN IMMUNITY.**

---

[3] The first summary judgment rulings were issued by Judge Muehlfeld on February 28, 2012. The second summary judgment ruling disposing of the case was issued by Judge Collier on October 22, 2012. There is not a clear explanation in the record for why two different trial judges were involved in this case. However, we note that Judge Collier took the bench in May of 2011 and the record indicates that Judge Muehlfeld was sitting on the case by assignment.

## ASSIGNMENT OF ERROR NO. III

**THE TRIAL COURT ERRED WHEN IT DENIED PLAINTIFFS RELIEF UNDER 42 USC 1983 FOR THE COUNTY'S DEPRIVATION OF A PROPETY INTEREST UNDER COLOR OF STATE LAW.**

### *Standard of Review*

**{¶24}** On appeal, the Rohrs argue that the trial court erred when it granted summary judgment in favor of the County Engineer.

**{¶25}** This Court reviews a grant of summary judgment de novo, without any deference to the trial court. *Conley–Slowinski v. Superior Spinning & Stamping Co.*, 128 Ohio App.3d 360, 363 (1998). A grant of summary judgment will be affirmed only when the requirements of Civ.R. 56(C) are met. This requires the moving party to establish: (1) that there are no genuine issues of material fact, (2) that the moving party is entitled to judgment as a matter of law, and (3) that reasonable minds can come to but one conclusion and that conclusion is adverse to the non-moving party, said party being entitled to have the evidence construed most strongly in his favor. Civ.R. 56(C); *see Horton v. Harwick Chem. Corp.*, 73 Ohio St.3d 679, 1995–Ohio–286, paragraph three of the syllabus.

**{¶26}** The party moving for summary judgment bears the initial burden of identifying the basis for its motion in order to allow the opposing party a "meaningful opportunity to respond." *Mitseff v. Wheeler*, 38 Ohio St.3d 112,

syllabus (1988). The moving party also bears the burden of demonstrating the absence of a genuine issue of material fact as to an essential element of the case. *Dresher v. Burt*, 75 Ohio St.3d 280, 292, 1996–Ohio–107. Once the moving party demonstrates that he is entitled to summary judgment, the burden shifts to the non-moving party to produce evidence on any issue which that party bears the burden of production at trial. *See* Civ.R. 56(E).

### *First Assignment of Error*

{¶27} In their first assignment of error, the Rohrs claim that the trial court erred when it granted summary judgment in favor of the County Engineer on the basis that governmental immunity barred their state tort claims.

{¶28} Under Ohio's Political Subdivision Tort Liability Act, codified under R.C. Chapter 2744, it is well-established that a reviewing court must engage in a three-tiered analysis to determine whether a political subdivision is entitled to immunity from civil liability. *Hubbard v. Canton Cty. Sch. Bd. of Edn.*, 97 Ohio St.3d 451, 2002–Ohio–6718, ¶ 10, *citing Cater v. Cleveland*, 83 Ohio St.3d 24, 28 (1998).

{¶29} First, is the general rule set forth under R.C. 2744.02(A)(1) that political subdivisions qualify for immunity. *Hubbard* at ¶ 10. Generally, political subdivisions are not liable for damages in civil actions for the "injury, death, or loss to a person or property allegedly caused by any act or omission of the political

subdivision or an employee of the political subdivision in connection with a governmental or proprietary function." R.C. 2744.02(A)(1).

**{¶30}** However, the immunity established under R.C. 2744.02(A)(1) is not absolute; and the political subdivision's immunity is subject to a list of exceptions under R.C. 2744.02(B)(1)-(5). Once general immunity has been established by the political subdivision, *the burden lies with the plaintiff to show that one of the five exceptions under R.C. 2744.02(B) apply. Brady v. Bucyrus Police Dept.*, 3d Dist. No. 3–10–21, 2011–Ohio–2460, ¶ 47. Thus, if the political subdivision is entitled to immunity under the first tier of the analysis, then the court must go to the second tier of the analysis and determine whether any of the exceptions to liability enumerated in R.C. 2744.02(B) apply. *Hubbard* at ¶ 12, citing *Cater*, 83 Ohio St.3d at 28.

**{¶31}** If any of the exceptions to immunity are found to be applicable, then the political subdivision will lose its immunity. If this occurs, then the court must move on to the third tier of the analysis, where it must determine whether the political subdivision's immunity can be reinstated as long as the political subdivision proves one of the defenses to liability under R.C. 2744.03. *See Contreraz v. Bettsville*, 3d Dist. 13-10-48, 2011-Ohio-4178, ¶ 23.

**{¶32}** Here, the parties do not dispute that the County is a political subdivision within the meaning of R.C. 2744.01(F). Therefore, the County

Engineer is immune from liability under R.C. 2744.02(A)(1) unless one of the five exceptions under R.C. 2744.02(B) applies. In their appellate brief, the Rohrs fail assert that any of the exceptions listed R.C. 2744.02(B) are applicable in this case to abrogate the County Engineer's immunity. Instead, the Rohrs attempt to bypass the second tier of the analysis to essentially argue that the County Engineer is liable for the loss of their tomato crop under R.C. 2744.03(A)(5), which is a defense to be considered *if the third tier of the analysis is invoked.*[4] *See Cater*, 83 Ohio St.3d at 32 (stating R.C. 2744.03(A)(5) "is a defense to liability; it cannot be used to establish liability"). It is only when the County Engineer points out in his appellate brief that the Rohrs have incorrectly applied the sequence of the three-tiered analysis, that the Rohrs then argue in their *reply brief* that the exception in R.C. 2744.02(B)(2) is applicable. Notwithstanding the Rohrs initial misapplication of the statute, we will address whether the County is subject to liability under R.C. 2744.02(B)(2).

---

[4] The defense to liability in R.C. 2744.03(A)(5) states:

**The political subdivision is immune from liability if the injury, death, or loss to person or property resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner.**

On appeal, the Rohrs maintain that the County Engineer's negligent implementation of the project was done with reckless disregard for the project plans. However, as previously discussed, the court does not even get to consider the defenses in R.C. 2744.03 until the plaintiff has demonstrated an exception to governmental immunity exists under R.C. 2744.02(B).

{¶33} R.C. 2744.02(B)(2) provides that a political subdivision is "liable for injury, death, or loss to person or property caused by the negligent performance of acts by their employees with respect to proprietary functions of the political subdivisions."  Thus, the applicability of this exception hinges on whether the County Engineer was engaged in a *proprietary function* at the time the public project was carried out.

{¶34} The statute recognizes that political subdivisions act in two defined capacities—"governmental functions" and "proprietary functions."  R.C. 2744.01(C)(1) defines a "governmental function" as a function of a political subdivision that is specified in division (C)(2) of this section or that satisfies any of the following:

> **(a)  A function that is imposed upon the state as an obligation of sovereignty and that is performed by a political subdivision voluntarily or pursuant to legislative requirement;**
>
> **(b)  A function that is for the common good of all citizens of the state;**
>
> **(c)  A function that promotes or preserves the public peace, health, safety, or welfare; that involves activities that are not engaged in or not customarily engaged in by nongovernmental persons; and that is not specified in division (G)(2) of this section as a proprietary function.**

Section 2744.01(C)(2) of the Revised Code specifies the following as examples of a governmental function which are pertinent to our consideration.

* * *

**(e) The regulation of the use of, and the maintenance and repair of, roads, highways, streets, avenues, alleys, sidewalks, bridges, aqueducts, viaducts, and public grounds;**

**\* \* \***

**(l) The provision or nonprovision, planning or design, construction, or reconstruction of a public improvement, including, but not limited to, a sewer system;**

**\* \* \***

**(r) Flood control measures;**

Section 2744.01(G)(1) of the Revised Code defines a "proprietary function" as a function of a political subdivision that is specified in division (G)(2) of this section or that satisfies both of the following:

**(a) The function is not one described in division (C)(1)(a) or (b) of this section and is not one specified in division (C)(2) of this section;**

**(b) The function is one that promotes or preserves the public peace, health, safety, or welfare and that involves activities that are customarily engaged in by nongovernmental persons.**

Section 2744.01(G)(2) provides that a " 'proprietary function' includes, but is not limited to, the following:"

**(a) The operation of a hospital by one or more political subdivisions;**

**(b) The design, construction, reconstruction, renovation, repair, maintenance, and operation of a public cemetery other than a township cemetery;**

**(c)   The establishment, maintenance, and operation of a utility, including, but not limited to, a light, gas, power, or heat plant, a railroad, a busline or other transit company, an airport, and a municipal corporation water supply system;**

**(d)   The maintenance, destruction, operation, and upkeep of a sewer system;**

**(e)   The operation and control of a public stadium, auditorium, civic or social center, exhibition hall, arts and crafts center, band or orchestra, or off-street parking facility.**

{¶35} In the instant case, the record reveals the following regarding the nature of the project at issue. Even though the project was initiated by Westhoven, the Rohrs' landlord, to address the drainage and flooding issues on his property, the County Engineer made an economic decision to handle the project "in house" as a "road safety improvement project" rather than as a ditch petition project. This meant that the County Engineer assumed the cost of the project instead of having the adjoining landowners pay assessments to fund the project.

{¶36} The record also reflects that the purpose of this project was to not only redesign and reconstruct the existing drainage system in the roadside ditch, but to also improve the public safety of County Road 3 by filling in the ditch and eliminating the hazard of the sharp "ditch fall-off." Notably, all of the work took place in the County's right-of-way on Country Road 3.

{¶37} Based on the applicable definitions enumerated in R.C. 2744.01, we do not find that this public improvement project constituted a proprietary function.

Other appellate courts have recognized reconstruction and improvement projects similar to the one performed in the case sub judice constitutes a governmental function. *See e.g., Guenther v. Springfield Twp. Trustees*, 2012 -Ohio- 203 (finding that redesign and reconstruction of a roadside drainage ditch is a governmental function); *Engel v. Williams County*, 6th Dist. No. F–07–027, 2008–Ohio–3852 (finding that maintenance of a roadside ditch is flood control measure and a governmental function). Therefore, we do not find that the exception in R.C. 2744.02(B)(2) is applicable in this case to abrogate the County Engineer's immunity. Furthermore, notwithstanding the fact that it is incumbent upon the Rohrs to demonstrate that one or more of the statutory exceptions apply, we note that we do not find that any of the other remaining statutory exceptions are applicable to impose liability on the County Engineer.

{¶38} Because we have found that none of the exceptions in R.C. 2744.02(B) are implicated in this case, our analysis stops here. Accordingly, despite the Rohrs' misplaced arguments pertaining to R.C. 2744.03(A)(5), we do not need to address whether any of the defenses to liability enumerated in R.C. 2744.03 apply. *See Feitshans v. Darke County et al.*, 116 Ohio App.3d 14, 22 (2d Dist. 1996) (stating "the defenses set forth in R.C. 2744.03 are only relevant where the plaintiff demonstrates that the government function at issue comes under a specific exception to general immunity").

{¶39} We also note that the Rohrs sued several county employees in their official and individual capacities. R.C. 2744.03(A)(6) provides the following regarding immunity afforded to an employee of a political subdivision:

> **In addition to any immunity or defense referred to in division (A)(7) of this section and in circumstances not covered by that division or sections 3314.07 and 3746.24 of the Revised Code,** *the employee is immune from liability unless one of the following applies:*
>
> **(a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;**
>
> **(b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;**

(Emphasis added).

{¶40} There is no evidence in the record to establish that the acts or omissions of any of these county employees were manifestly outside the scope of their employment or official responsibilities *or* that these employees acted with a malicious purpose or in a wanton or reckless manner in executing the County's project plans. Thus, pursuant to the statute, the county employees named in this action are also entitled to immunity.

{¶41} For all these reasons, we find there are no genuine issues of material fact that the County Engineer is entitled to immunity pursuant to R.C. 2744.02(A)(1) and that the county employees are entitled to immunity pursuant to R.C. 2744.03(A)(6). Therefore, we conclude the trial court did not err when it

granted summary judgment on the basis that governmental immunity barred the Rohrs' state tort claims. The Rohrs' first assignment of error is overruled.

*Second Assignment of Error*

**{¶42}** In their second assignment of error, the Rohrs claim that the trial court erred in overruling their motion for an issuance of a writ of mandamus to compel the County Engineer to institute appropriation proceedings to compensate them for the loss of their tomato crop and for the interference of their use and enjoyment of their leasehold interest. Specifically, the Rohrs argue that the flooding of their leasehold interest, which caused damage to their tomato crop and occurred as a result of the County's public works project, amounted to a *pro tanto* (or partial) taking in violation of the United States and Ohio Constitutions.

**{¶43}** "The United States and Ohio Constitutions guarantee that private property shall not be taken for public use without just compensation." *State ex rel. Shemo v. Mayfield Hts*., 95 Ohio St.3d 59, 63 (2002), judgment modified in part on other grounds, 96 Ohio St.3d 379, 2002-Ohio-4905; Fifth and Fourteenth Amendments to the United States Constitution; Section 19, Article I, Ohio Constitution. "Mandamus is the appropriate action to compel public authorities to institute appropriation proceedings where an involuntary taking of private property is alleged." *Shemo*, 95 Ohio St.3d at 63.

{¶44} To be entitled to the requested writ of mandamus, the Rohrs must establish a clear legal right to compel the County Engineer to commence an appropriation action, a corresponding clear legal duty on the part of the County Engineer to institute that action, and the lack of an adequate remedy in the ordinary course of law. *State ex rel. Gilbert v. Cincinnati*, 125 Ohio St.3d 385, 2010-Ohio-1473, ¶ 15. The Rohrs must prove their entitlement to the writ by clear and convincing evidence. *State ex rel. Doner v. Zody*, 130 Ohio St.3d 446, 2011-Ohio-6117, ¶ 57.

{¶45} The Rohrs' mandamus action is one for inverse-condemnation, which is "a cause of action against the government to recover the value of property taken by the government without formal exercise of the power of eminent domain." *Moden v. United States*, 404 F.3d 1335, 1342 (Fed.Cir.2005). The Rohrs claim that they are entitled to relief in mandamus pursuant to the Takings Clause of the Ohio Constitution. Section 19, Article I of the Ohio Constitution provides:

> **[W]here private property shall be taken for public use, a compensation therefor shall first be made in money, or first secured by a deposit of money, and such compensation shall be assessed by a jury, without deduction for benefits to any property of the owner.**

{¶46} The Supreme Court of Ohio has observed that "Section 19, Article I of the Ohio Constitution limits compensation to those situations where private

property is *taken* for public use, in contrast to the constitutions of some states, which guarantee compensation for private property that is taken for *or damaged by* public use." *State ex rel. Blank et al. v. Beasley*, 121 Ohio St. 3d 301, 2009-Ohio-835, ¶ 17 citing *State ex rel. Fejes v. Akron*, 5 Ohio St.2d 47, 50 (1966) (emphasis sic). Accordingly, the Supreme Court has "construed this constitutional provision to require a property owner to prove something more than damage to his property in order to demonstrate a compensable taking." *Beasley* at ¶ 17.

{¶47} In *Beasley*, the Supreme Court examined takings claims predicated on the unintentional damage caused to private property during the completion of a public project. Specifically, the Court in *Beasley* analyzed the public use served by the damage and the corresponding remedy available to the claimant. The Court observed that a number of jurisdictions, including Ohio, have rejected takings claims when the alleged taking resulted from the negligent acts of public officers or their agents during the course of completing a public project and found that the appropriate remedy lies in a state tort action. *See Beasley* at ¶¶ 18-28.

{¶48} The rationale underlying these decisions is that when the damage to private property is foreseeable as a direct and necessary consequence of the construction or operation of the public use—*i.e., the consequent damage to the private property served a public use*—then a taking has occurred and the plaintiff is entitled to just compensation. However, when the damage claim is based on "

'a tort, being caused by the negligence of public officers or their agents, *it cannot be said that property is taken or damaged for public use*' and the "owner is relegated in such case to a common-law action for damage.' " *Id*. at ¶¶ 22-24, *citing Chavez v. Laramie*, 389 P.2d 23, 24-25 (Wyo. 1964) (emphasis sic).

{¶49} The Court in *Beasley* anticipated that plaintiffs may argue that the term "for public use" should apply *any time* that private property is damaged during the performance of a public purpose. However, the Court specifically noted that " 'courts tend to interpret 'for public use' to mean 'in order to accomplish a public use.' " *Beasley*, 121 Ohio St.3d at ¶ 28, *quoting* 4 TIFFANY REAL PROPERTY, Section 1254 (1975).

{¶50} In a more recent case, the Supreme Court of Ohio reiterated these concepts when it discussed the following two-part test for claims of inverse-condemnation by flooding:

> **[N]ot every 'invasion' of private property resulting from government activity amounts to an appropriation. The line distinguishing potential physical takings from possible torts is drawn by a two-part inquiry. First, a property loss compensable as a taking only results when the government intends to invade a protected property interest or the asserted invasion is the 'direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action.' * * * Second, the nature and magnitude of the government action must be considered. Even where the effects of the government action are predictable, to constitute a taking, an invasion must appropriate a benefit to the government at the expense of the property owner, or at least preempt the owner's**

-23-

> **right to enjoy his property for an extended period of time, rather than merely inflict an injury that reduces its value.**

*State ex rel. Doner v. Zody*, 130 Ohio St.3d 446, 2011-Ohio-6117, ¶ 64, citing *Ridge Line, Inc. v. United States*, 346 F.3d 1346 (Fed.Cir.2003). (Internal citations omitted).

{¶51} With these principles in mind, we turn our attention to the issues raised in the instant case.

{¶52} The uncontroverted evidence in the record establishes that the County Engineer's plans called for any working field tile entering into the ditch from the east to be tied into the new drainage pipe system replacing the ditch. The plans also called for any pipes coming from underneath County Road 3 that are determined to be no longer in use to be filled with LSM 50, a concrete grout mixture, to ensure the safety and integrity of the road. The record indicates that the County Engineer devised this plan with the assistance of Westhoven, the landowner of the Rohrs' leased parcel. County employees executed the project according to the engineering plans in the fall of 2002—several months prior to the Rohrs entering into their lease with Westhoven.

{¶53} At this time, county employees encountered a metal county crossover pipe which contained "sufficient debris and did not indicate drainage." (Murray Affidavit at ¶ 4 and Walker Affidavit at ¶ 4). County employees also discovered a buried catch basin, not marked on the plans, which also contained debris and berm

material. The presence of berm debris in this area coupled with the fact that the adjoining Saul farm had recently been retiled with the drainage flowing west, away from County Road 3, led county employees to the conclusion that the pipe and the catch basin were part of an obsolete system no longer in use. As a result, county employees followed protocol and filled the pipe and catch basin with LSM 50. According to the record, neither Westhoven nor the engineering plans indicated that a functioning field tile was situated in the vicinity of this pipe and catch basin. Instead, evidence in the record demonstrates that had county employees been made aware of a field tile's existence in this area, this pipe and catch basin would not have been filled with LSM 50.

{¶54} We are simply not persuaded by the Rohrs' bald assertions that the mere presence of a seed bag in the field tile establishes that the County Engineer or his employees had actual knowledge of the field tile's existence, and therefore is proof that county employees intentionally blocked the field tile. Moreover, there is nothing in the record to even insinuate that the flooding of the southeast corner of the Westhoven field was an intentional invasion of the Rohrs' private property or a direct, natural, or probable result of the County's improvement project. To the contrary, one of the stated objectives of this project was to *improve* the drainage and/or flooding issues in the Westhoven field. We further find that the record establishes that the County appropriated no benefit from the

damage caused by the July 2003 flooding, for which the Rohrs are seeking compensation.

{¶55} In short, we find that the uncontroverted evidence in the record establishes that any action on the part of the County Engineer or his employees in rendering the field tile inoperable was unintentional and accidental. Furthermore, we find that the Rohrs have failed to demonstrate that any injury incurred to their private property was done so by the County Engineer for public use or to accomplish a public use so as to constitute a taking under either the U.S. or Ohio Constitutions.

{¶56} Finally, notwithstanding the fact that the record does not support the Rohrs' claim that a taking has occurred, we note that the Rohrs are not entitled to a writ of mandamus because they have failed to demonstrate that they lack an adequate remedy in the ordinary course of law. Specifically, as discussed by the Supreme Court in *Beasley*, the appropriate remedy in this case lies in a state tort action—whether that is an action against the County Engineer or against Westhoven, as the lessor who assured them the field contained adequate drainage for growing tomatoes. We further note that the Rohrs are not without an adequate remedy simply because they pursued their state tort claims against the County and failed to receive a favorable decision due to the application of governmental immunity. "Where a plain and adequate remedy at law has been unsuccessfully

invoked, the extraordinary writ of mandamus will not lie either to relitigate the same question or as a substitute for appeal." *State ex rel. Zimmerman v. Tompkins*, 75 Ohio St.3d 447, 449, 1996–Ohio–211, *citing State ex rel. Nichols v. Cuyahoga Cty. Bd. of Mental Retardation & Dev. Disabilities*, 72 Ohio St.3d 205, 209, 1995–Ohio–215.

**{¶57}** Moreover, allowing plaintiffs whose claims are precluded by governmental immunity to bring a mandamus action as an alternative remedy would effectively allow those plaintiffs to circumvent the legislatively prescribed statutory scheme established in Chapter 2744. *See Beasley*, 121 Ohio St.3d at ¶ 28, *quoting* 4 TIFFANY REAL PROPERTY, Section 1254 (1975) ("If we permitted the theory of plaintiffs to prevail in this case, we would subject the state and city to actions for damages in all cases involving injuries to or destruction of private property resulting from the torts of their agents, when acting in an official capacity. This would effectually repeal the universal rule that a state exercising governmental functions cannot be made to respond in damages for tort and is not liable for the torts of its officers or agents in the discharge of their official duties, unless it has voluntarily assumed such liability and consented to be liable.").

**{¶58}** For all these reasons, we conclude the trial court did not err in overruling the Rohrs' motion for a writ of mandamus to compel the County

Engineer to institute appropriation proceedings. The Rohrs' second assignment of error is overruled.

### *Third Assignment of Error*

**{¶59}** In their third assignment of error, the Rohrs claim that they have suffered a violation of their due process rights under 42 U.S.C. § 1983.

**{¶60}** To establish a violation of Section 1983, two elements are required: "(1) the conduct in controversy must be committed by a person acting under color of state law, and (2) the conduct must deprive the plaintiff of rights, privileges or immunities secured by the Constitution or laws of the United States." *1946 St. Clair Corp. v. Cleveland*, 49 Ohio St.3d 33, 34 (1990), *citing*, *Parratt v. Taylor*, 451 U.S. 527, 535(1981).

**{¶61}** The Rohrs predicate their Section 1983 claims on alleged violations of the Fifth and Fourteenth Amendments to the United States Constitution.

**{¶62}** The Fifth Amendment states that "[n]o person shall be * * * deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." Fifth Amendment of the U.S. Constitution. In making their Fifth Amendment argument, the Rohrs are essentially reasserting their takings claim. As we determined in the previous assignment of error, the Rohrs failed to demonstrate that their private property was taken for public use and therefore failed to establish that a taking occurred.

{¶63} The Fourteenth Amendments protects against deprivations "without due process of law." *1946 St. Clair*, 49 Ohio St.3d at 34, *citing*, *Baker v. McCollan*, 443 U.S. 137 (1979). In *1946 St. Clair*, the Supreme Court of Ohio noted that, in a Section 1983 claim, "[p]roperty interests are distinguished from life or liberty interests because property interests are founded on the procedural aspects of due process; they are not substantive rights created by the federal Constitution." *Id.* at 36, *citing Cooperman v. Univ. Surgical Assoc., Inc.*, 32 Ohio St.3d 191, 200 (1987). Where the claim asserted rests on the deprivation of a property interest alone, the constitutional right invoked is the procedural due process right to notice and hearing. *Cooperman* at 200, *citing Hudson v. Palmer*, 468 U.S. 517, 530-537 (1984); *Parratt*, supra, at 536-545; *Bd. of Regents v. Roth*, 408 U.S. 564 (1972). "The United States Supreme Court has held that no due process violation occurs when the state provides an adequate post-deprivation remedy for a loss of property caused by the negligence of state officials." *St. Clair* at 34 *citing Parratt, supra,* 451 U.S. at 535-544. Moreover, "to assert a claim under Section 1983, Title 42, U.S.Code and the Fourteenth Amendment for deprivation without due process of a purely economic interest, a plaintiff must allege and prove the inadequacy of state remedies." *Id.*

{¶64} As previously discussed, the Rohrs have adequate state remedies at their disposal and have failed to prove the inadequacies of those remedies.

Therefore, the Rohrs have not demonstrated that they are entitled to relief under Section 1983 and we find no error in the trial court's decision to grant summary judgment on this basis. Accordingly, the Rohrs' third assignment of error is overruled.

{¶65} Based on the foregoing, the judgment of the Henry County Court of Common Pleas is affirmed.

*Judgment Affirmed*

**PRESTON, P.J. and ROGERS, J., concur.**

**/jlr**