[Cite as *In re Adult Protective Servs. of Devanan*, 2023-Ohio-121.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

IN THE MATTER OF ADULT
PROTECTIVE SERVICES OF:

NETA DEVANAN

:

:     CASE NO. CA2022-06-039

:     O P I N I O N
       1/17/2023

:

:

:

APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
PROBATE DIVISION
Case No. 2022 9064

David P. Fornshell, Warren County Prosecuting Attorney, and Adam M. Nice, Assistant Prosecuting Attorney, for appellee.

Lauren L. Clouse, for appellant.

**BYRNE, J.**

{¶ 1}  Neta Devanan appeals from a decision of the Warren County Court of Common Pleas, Probate Division, which granted the county's petition for adult protective services and placed Neta in a nursing home.  For the reasons described below, we affirm.

**I. Facts and Procedural Background**

{¶ 2}  On April 20, 2022, the Warren County Department of Job and Family

Services, Adult Protective Services ("APS" or "the agency"), petitioned the court pursuant to R.C. 5101.68 for protective services for Neta. The petition alleged that Neta was 67 years old and was an incapacitated person subject to abuse, neglect, or exploitation. More specifically, the petition alleged that in March 2022, Neta had been pushed down by her husband, Tejpersuad Devanan, had broken her hip, and had received medical care and rehabilitation. The petition further alleged that since her release from rehabilitation, she had not received proper hygiene care or medical care, could not provide for her own care, and that she was verbally abused by Tejpersuad and by her son, Deon Devanan.

{¶ 3} The following day, April 21, 2022, APS requested that the probate court immediately conduct an ex parte emergency telephone conference for purposes of issuing an ex parte emergency order placing Neta in residential care pursuant to R.C. 5101.70. The probate court held the ex parte emergency telephone conference that day and the court verbally granted APS's petition and ordered that Neta be placed in residential nursing care. This verbal order was issued pursuant to R.C. 5101.70 and, apparently, R.C. 5101.701. As a result of the ex parte emergency order, APS moved Neta from her home to residential nursing care.

{¶ 4} The next day, April 22, 2022, APS followed up by filing a corresponding written petition for emergency protective services pursuant to R.C. 5101.70. The petition alleged that the agency was seeking emergency protective services because Neta could not care for herself "in any manner" after Tejpersuad "was hospitalized after losing consciousness allegedly due to alcohol use" and when Deon was also unconscious from alcohol abuse. Neta also had unexplained bruising and wounds, and bandages that had not been changed in weeks. Neta was left without anyone to care for her and as a result was not receiving assistance with hygiene, wound care, or feeding.

{¶ 5} The same day the probate court held a probable cause hearing pursuant to

R.C. 5101.702 and issued a written order granting APS's petition for emergency protective services. The court found that Neta was in need of emergency protective services, including residential nursing care. The order also scheduled a "full hearing on this matter."

{¶ 6} The court held the full hearing on May 4, 2022. We summarize the hearing testimony below.

## A. Adult Protective Services Case

### 1. Kimberly Frick

{¶ 7} Kimberly Frick testified that she worked for APS. The agency receives referrals for adults who are alleged to be neglected or exploited. In July 2020, she received a referral for Neta. The referral alleged that Neta had twice been strangled by Deon.

{¶ 8} Frick testified that Neta was 67 years old and wheelchair bound. Neta suffered from stage five kidney failure, high blood pressure, diabetes, and other health issues. After receiving the referral for Neta, Frick saw Neta at least once a month and sometimes once a week.

{¶ 9} Having seen Neta regularly for almost two years, Frick concluded that Neta could not care for herself without assistance. Neta could not bathe herself, get out of her wheelchair to use the restroom, or get onto her stairlift. She could feed herself but could not prepare food. Neta claimed to be able to take her own medication, but Frick was aware that Neta had missed taking her medication and Neta "wasn't able to remember to take them."

{¶ 10} Neta required dialysis three times weekly. She did not drive. Previously, Deon had driven her to her dialysis appointments. More recently, she was getting to dialysis by a medical transport company.

{¶ 11} Frick stated that when she first met Neta, the condition of her home was "deplorable." She observed medications on the steps, rotten food and plates on the floor,

and moldy dishes in the kitchen that had been there for months. The refrigerator needed to be cleaned and had an "overwhelming" smell.

{¶ 12} Frick arranged for the Elderly Services Program to provide Neta with multiple services. These services included Meals on Wheels, medical transportation, a medical alert button, and home health care. The home health care component involved someone coming to Neta's home and cleaning her room and clothes for two hours per week. The agency had a stairlift installed because Neta was not able to get up or down her home's stairs without sliding. APS also had a ramp installed in Neta's garage. Finally, Frick helped Neta apply for food stamps.

{¶ 13} Frick was successful in arranging these services and Neta received these services for some time. However, by the time of the hearing, Frick believed that the services were not sufficient to allow Neta to continue living independently, and that that a nursing facility was the only safe option. Frick testified that Neta needed round-the-clock care to assist her with feeding, using the bathroom, and bathing.

{¶ 14} Frick explained that initially Tejpersuad and Deon were responsible for Neta's care outside the weekly two hours when the in-home care service providers were present. Then, Tejpersuad had had two strokes and moved back to live with his family out of state, leaving Deon to care for Neta.

{¶ 15} In March 2021, APS staff began discussing applying for a guardianship for Neta because Deon was not doing his part to care for Neta. However, Tejpersuad agreed to come home and take care of Neta. He did so and this arrangement worked for about six months. Then Tejpersuad began drinking alcohol.

{¶ 16} In March 2022, the agency received a referral from a police department that Neta had broken her hip. Neta told Frick that she and Tejpersuad were arguing over money and his alcohol use. He got upset and pushed her out of her wheelchair, causing her to

break her hip. Frick testified that Neta went to the hospital and that Tejpersuad and Deon later took her back home.

{¶ 17} Frick stated that she was familiar from her previous work as a drug and alcohol therapist with intoxicated persons and that she was aware that Tejpersuad and Deon were both drinking excessively. She had seen evidence of excessive alcohol use in their appearance and behavior and other indications in the home, including empty bottles of alcohol around the house. She said she had spoken to Deon about his alcohol use and he denied it was a problem. But he later admitted to an alcohol "issue" when she confronted him in the presence of a police officer. Neta told Frick that Tejpersuad drank "a lot" and that Deon was an alcoholic too.

{¶ 18} Frick was aware of an allegation that Deon had, while intoxicated, thrown a steel toe shoe at Neta and knocked her unconscious. Frick stated that the severity of Deon's alcohol abuse had increased in the nearly two years she had been visiting the home. Neta also told Frick that Deon was eating her food from Meals on Wheels.

{¶ 19} Frick testified that her concerns were that Tejpersuad and Deon would be unconscious from excessive alcohol use and unable to care for Neta when she needed help. She mentioned that if there were a fire, Neta would be stuck in her room on the second floor and that Neta could not cook for herself or go to the bathroom when Tejpersuad and Deon were unconscious from intoxication. Frick believed that APS had tried less restrictive options for providing care to Neta and that "a nursing facility is the only safest way for her right now."

### 2. Matt Greggerson

{¶ 20} Matt Greggerson testified that he was an emergency medical technician. On April 7, 2022, he transported Neta from Atrium Medical Center to her residence, following her discharge from the hospital. Upon arriving at the residence, Neta made a comment that

"he's probably drunk again."  Greggerson offered to take her back to the hospital, but she insisted on continuing into the house, and said "just put me in bed."

{¶ 21} Greggerson and his coworker carried Neta inside the residence on a stretcher and then lifted her onto the stairlift system to move her upstairs.  When they entered the home, Greggerson could smell alcohol on Deon, who appeared "very intoxicated."  Both Tejpersuad and Deon were having trouble standing.  They were "all over the spectrum." Tejpersuad became emotional and began to cry.

{¶ 22} Deon kept trying to help Greggerson and his coworker while they were moving Neta.  They had to tell Deon to back up and let them do their jobs.  Deon grabbed Neta's arm and was trying to pull her.  Deon was going to hurt Neta, so they told him to stop.  Deon stumbled while walking up the stairs.  Greggerson believed that Deon was not capable of providing care for Neta in his intoxicated state.   He also believed Tejpersuad was intoxicated.  After the medical technicians left, Greggerson made a referral to APS and requested that the police perform a welfare check.

### 3. Brad Gibson

{¶ 23} Brad Gibson testified that he was a registered nurse with a home health care company.  He began seeing Neta in early April 2022.  On April 12, 2022, he noted a large bandage on Neta's lower backside.  He removed the bandage and found a five-centimeter ulceration, which he believed was "probably" infected.  He believed that this kind of bandage should be changed daily to avoid infection, yet it had not been changed in some time.

{¶ 24} Gibson also noted that he had asked Neta, Tejpersuad, and Deon if Neta had any wounds, and they denied that she did.  But Gibson noted a large, roughly hand-size bruise on Neta's right forearm.  He did not believe that this bruise was likely to happen from a fall.  Gibson did not ask Neta questions about how she became bruised because he noticed that she became quiet around her family members.  He was concerned with what

might happen to her after he left the home.

**{¶ 25}** Gibson treated Neta again a few days later. When he found her, she was sitting in her own liquid feces. He also observed a plastic wash basin full of dirty adult diapers nearby. Gibson found Neta so impacted by stool that he had to use his fingers to remove the stool. He had never removed so much stool from someone's rectum in his 25-year career. The stool was so hard that Neta's rectum was protruding from her body. Gibson believed that the stool impaction was due to constipation and/or lack of fluid intake. Gibson stated that this situation could have sent Neta to the hospital with "further really bad complications" if he had not acted.

### 4. Edward Goschinski

**{¶ 26}** Edward Goschinski testified that he was a fireman and an EMS provider. On April 15, 2022, he was dispatched to Neta's home at 10:25 a.m. The dispatch stated that Neta had fallen and was not able to get up, and that her husband and son were drunk.

**{¶ 27}** When Goschinski arrived, he and his fellow first responders found Neta on the ground between her wheelchair and the bed. Goschinski noted that Neta had "sores on her * * * bottom because she had defecated and was sitting in those." Neta told Goschinski and the other first responders that a nurse would come by and assist her with that but that the nurse had not been by that day.

**{¶ 28}** Goschinski noted that Neta's medical transport to dialysis was waiting outside the residence. During the time that he and the other first responders spent trying to lift Neta into her wheelchair, then get her down the stairs and outside, the medical transport vehicle left because it ran out of time on its schedule. However, they were able to get the medical transport vehicle to return. Goschinski believed that Neta would not have received her dialysis treatment if he and the other first responders had not been there that day.

**{¶ 29}** During this exchange Tejpersuad was sitting on the bed by Neta, crying.

Tejpersuad at one point offered a hand to help her up and she refused, stating that he had drank too much. Goschinski concluded that Deon was intoxicated, too.

### B. Neta's Case

### 1. Neta Devanan

{¶ 30} Neta testified that Tejpersuad was 62 years old, and Deon was 31 years old. Tejpersuad normally took care of her and cooked for her. She stated that she felt "very safe" with Tejpersuad and Deon.

{¶ 31} Neta testified that she broke her hip when she fell while at dialysis, not when Tejpersuad pushed her. She had no concerns about going home. She wanted to go home because "Home is where your heart is."

{¶ 32} On cross-examination, Neta testified that Deon "sometimes" drank too much, and that Deon knew his limits. She denied that he ever passed out from drinking. She denied needing help with getting dressed, bathing, or getting on the toilet. She also denied needing help getting into the stairlift and stated that she could do that by herself, but that she allowed Tejpersuad to assist her. She claimed that Tejpersuad or Deon can help her when the other is drunk, or if they both get drunk, they take care of her first before they start drinking. She denied that Deon eats her Meals on Wheels food. Throughout her testimony, Neta was adamant that she wanted to return home. When the judge asked if she would prefer a particular nursing home, Neta did not answer and simply stated that she wanted to live at home.

### 2. Deon Devanan

{¶ 33} Before summarizing Deon's testimony, we note that the record contains a recorded interaction between the court's bailiff and Tejpersuad and Deon, which occurred prior to the start of the hearing on the petition. In it, the bailiff questioned Tejpersuad and Deon about their alcohol use and an apparent earlier promise by both men to not have

- 8 -

alcohol in their system when they appeared for court.

{¶ 34} The bailiff administered a breath test to both men. Deon tested positive and apparently registered a 0.21 blood alcohol content, which the bailiff noted was three times the legal limit for driving. Tejpersuad tested negative and stated he had last drank two days earlier. Deon admitted he drank alcohol the prior evening and that while his father drove from their home to the highway that morning, Deon drove the rest of the way to the courthouse.

{¶ 35} Prior to his testimony, the court questioned Deon to determine his competency to testify. Deon stated that he was 30 years old. He had no job, but he assisted his parents. Deon stated that he drank 700 to 800 milliliters of vodka the night before the hearing and that he started drinking at around 7 p.m. Ultimately, the court permitted Deon to testify.

{¶ 36} Deon testified that he had been taking care of his mother since 2011. Either he or Tejpersuad would heat up her Meals on Wheels food because Neta was not able to heat up meals for herself. Normally, Tejpersuad would assist Neta with bathing. Deon agreed that Neta could not walk without assistance, usually needed help getting in and out of the stairlift, and could not drive. Deon denied knowing who arranged for most of the services that Frick testified she arranged.

{¶ 37} On cross-examination, Deon agreed that on the day of Neta's emergency removal, he drank enough alcohol that he "passed out." He agreed that no one was available to assist Neta when Tejpersuad was seizing from alcohol withdrawal, and Deon was "passed out."

{¶ 38} As to his alcohol use prior to the hearing, Deon explained that he expected that the court would put him on alcohol monitoring. He explained his thought process as, "meh," "might as well enjoy it while I can."

**C. The Decision**

{¶ 39} The probate court found by clear and convincing evidence that Neta was a person 60 years of age or older who was wheelchair-bound and unable to ambulate without serious risks of falls or injury and who had numerous medical issues preventing her from providing for her own care or protection while living in a private residence. The court further found that Neta was a neglected adult who had failed to provide for herself the goods or services necessary to avoid physical harm.

{¶ 40} The probate court found that Neta was in need of protective services and that she was incapacitated, to the extent that while she had sufficient understanding to make certain reasonable decisions about her daily living, she lacked the ability to facilitate her own provision of food, shelter, clothing, and health necessary for life support. Accordingly, the probate court ordered Neta removed from her residence and placed in a nursing facility. The court noted that Neta only wished to remain in her private residence and had not suggested any other possible less restrictive alternatives. The court found that a nursing facility was the least restrictive alternative available that could meet her needs.

**II. Law and Analysis**

{¶ 41} Neta appealed, raising the following sole assignment of error:

{¶ 42} THE TRIAL COURT ERRED IN FINDING, BY CLEAR AND CONVINCING EVIDENCE, THAT THE APPELLANT WAS IN NEED OF PROTECTIVE SERVICES PURSUANT TO R.C. 5101.682(B) AND BY ORDERING OUT OF HOME PLACEMENT FOR THE APPELLANT PURSUANT TO R.C. 5101.682(C).

{¶ 43} Neta argues that the probate court erred in finding by clear and convincing evidence that she required protective services, that she was a neglected person, that she was incapacitated, and that she should be placed outside of her home.

**A. Burden of Proof and Standard of Review**

**{¶ 44}** The burden of proof in an adult protective services case is clear and convincing evidence. R.C. 5101.682(B). "Clear and convincing evidence" is that measure or degree of proof which is more than a "preponderance of the evidence," but does not require the extent of certainty as the "beyond a reasonable doubt" measure in criminal cases. *State ex rel. Doner v. Zody*, 130 Ohio St.3d 446, 2011-Ohio-6117, ¶ 54. "Clear and convincing evidence" will produce in the mind of the trier of facts "a firm belief or conviction as to the facts sought to be established." *Id.*

**{¶ 45}** Whether the petitioner has proven by clear and convincing evidence the requirements for an order for adult protective services is a factual determination for the probate court, which an appeals court will not disturb unless those findings are against the manifest weight of the evidence. *See In re A.L.S.*, 12th Dist. Butler No. CA2017-09-146, 2018-Ohio-507, ¶ 17; *In re G.T.R.*, 12th Dist. Clermont No. CA2007-03-039, 2007-Ohio-3719, ¶ 16.

**{¶ 46}** Neta phrases some of her arguments as challenging the sufficiency of the evidence. However, Neta does not make a sufficiency argument; for example, she does not argue that the state failed to submit any evidence on a particular element of the county's case. Instead, Neta argues that the evidence did not rise to the level of clear and convincing evidence. Therefore, rather than challenging the sufficiency of the evidence, the true nature of Neta's arguments is a challenge to the manifest weight of the evidence. For that reason, we review the case for the manifest weight of the evidence.

**{¶ 47}** "The standard of review for weight of the evidence issues, even where the burden of proof is 'clear and convincing,' retains its focus upon the existence of 'some competent, credible evidence.'" *Estate of Hand*, 12th Dist. Butler No. CA2016-02-034, 2016-Ohio-7437, ¶ 28, quoting *In re Jordan*, 4th Dist. Pike No. 08CA773, 2008-Ohio-4385,

¶ 9. We will not reverse a trial court's decision as being against the manifest weight of the evidence if some competent, credible evidence supports it. *Id.*

**{¶ 48}** In determining whether a judgment is against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that there must be a reversal of the judgment and an order for a new trial. *In re L.C.W.*, 12th Dist. Butler No. CA2014-08-169, 2015-Ohio-61, ¶ 14. In so doing, we must be mindful the probate court "is in the best position to observe the demeanor of the parties and assess the credibility and accuracy of the testimony." *In re Adoption of C.A.L.*, 12th Dist. Clermont No. CA2015-01-010, 2015-Ohio-2014, ¶ 29.

### B. Evidence of Need of Protective Services, Neglect, and Incapacity

**{¶ 49}** A county department of job and family services that determines that an adult needs protective services and is an incapacitated person may petition the court for an order authorizing the provision of protective services. R.C. 5101.68. At the hearing on the petition, the court *must* issue an order for protective services if services are available locally and if the court finds by "clear and convincing evidence, that the adult has been abused, neglected, or exploited, is in need of protective services, and is incapacitated * * *." R.C. 5101.682(B).[1] As will be discussed below, these are defined terms and phrases touching

---

1. In her appellate brief, Neta points out that the probate court's decision is unclear as to whether the court was proceeding on the agency's petition under R.C. 5101.682 or rather under R.C. 5101.702, the latter of which governs the requirements for a probable cause hearing following an emergency order for protective services issued pursuant to R.C. 5101.701. While the order and entry states that it concerns the emergency petition filed on April 22, 2022, the court's analysis appears to follow the more stringent requirements set forth in R.C. 5101.682. This is because if the court had instead proceeded to review the petition only under R.C. 5101.702, then the issues would have been limited to probable cause and a determination of whether protective services were the least restrictive alternative available. R.C. 5101.702(A) and (B)(1). Both Neta and the state appear to agree that the trial court correctly analyzed the evidence pursuant to R.C. 5101.682. Because the parties do not dispute the issue, we analyze the case in the same manner.

on overlapping factual issues. We therefore analyze them together.

**{¶ 50}** The probate court found that Neta was neglected. "Neglect" means *any* of

the following:

> (1) Failure of an adult to provide for self the goods or services necessary to avoid physical harm, mental anguish, or mental illness;
>
> (2) Failure of a caretaker to provide such goods or services;
>
> [or]
>
> (3) Abandonment.

R.C. 5101.60(O). "In need of protective services" is defined as "an adult known or

suspected to be suffering from abuse, neglect, or exploitation to an extent that either life is

endangered or physical harm, mental anguish, or mental illness results or is likely to result."

R.C. 5101.60(K). "Incapacitated person" means,

> a person who is impaired for any reason to the extent that the person lacks sufficient understanding or capacity to make and carry out reasonable decisions concerning the person's self or resources, with or without the assistance of a caretaker.

R.C. 5101.60(L). "Reasonable decisions" means "decisions made in daily living that

facilitate the provision of food, shelter, clothing, and health care necessary for life support."

R.C. 5101.60(T).

**{¶ 51}** Upon review, we find that the record contains an abundance of competent,

credible evidence establishing that Neta was in need of protective services, that she was

neglected, and that she lacked the capacity to make or carry out reasonable decisions

concerning herself or her resources.

**{¶ 52}** As discussed above, the evidence demonstrated Neta was wheelchair-bound,

had stage five kidney failure requiring dialysis treatments three times a week, and was a

diabetic. Due to her mobility issues, she was wholly dependent upon assistance to carry

- 13 -

out basic life functions. She could not walk without assistance, she could not bathe without assistance, she could not go to the bathroom without assistance, and she could not get on to her stairlift without assistance. Neta could feed herself but was unable to prepare her own food. Neta could not drive and required others to transport her anywhere, including to her dialysis appointments.

{¶ 53} Frick testified as to all the services that the agency had arranged to help with food consumption (through Meals on Wheels), with medical transportation, and with skilled nursing care visits. In addition, the agency had installed a ramp and stairlift and provided a medical alert device. Despite all these services, Frick nevertheless opined that the services were insufficient to keep Neta safe from physical harm.

{¶ 54} Frick believed that Neta needed someone to care for her more than the two hours per week of in-home care she received. Instead, she needed someone to be available around the clock to help with feeding, going to the bathroom, and bathing. Frick testified Tejpersuad and Deon had previously been responsible for assisting Neta with these matters, but that neither were doing their part to care for her due to their alcohol abuse.

{¶ 55} Overwhelming evidence supported Frick's concerns with Tejpersuad and Deon's alcohol abuse and their inability to act as caretakers for Neta. Frick had interacted with both Tejpersuad and Deon when they were intoxicated. She had seen empty bottles of vodka in the house. Neta had confirmed to her that both Tejpersuad and Deon were alcoholics. The fact that Deon appeared in court intoxicated, and his complete lack of self-awareness as to the inappropriateness of his behavior, underscores the severity of his alcohol abuse.

{¶ 56} Frick's major concern was that Tejpersuad and Deon would be unconscious from alcohol abuse when Neta needed assistance. Frick's concern was grounded in reality.

Deon admitted during his testimony that he was passed out from alcohol use while Tejpersuad was seizing from alcohol withdrawal. Deon confirmed that no one was available to assist Neta at this time.

{¶ 57} EMT Greggerson and Fireman Goschinski confirmed the agency's concerns. Tejpersuad and Deon were observed so intoxicated that they could barely stand, much less act as caretakers for Neta. Had Greggerson and Goschinski not been available to assist Neta, she would not have been able to get to her bed, she would have missed a dialysis appointment, and she may have been physically harmed.

{¶ 58} Neta testified that she felt safe at home and that she had no concerns about living at home. She claimed that she did not need help with bathing or getting on the toilet and that she "does it all by herself." But Neta's claim that she did not need any help was contradicted by all other evidence submitted at the hearing, including that of Deon. The trial court could justifiably decline to believe Neta's testimony on this subject, and we defer to the factfinder on matters of witness credibility. *In re L.S.*, 12th Dist. Warren Nos. CA2017-11-157, CA2017-11-160, 2018-Ohio-1981, ¶ 29.

{¶ 59} In this case, the state presented overwhelming evidence to support the conclusion that Neta was an adult in need of protective services. Due to her physical condition and numerous medical issues, Neta required numerous services and round-the-clock care. Neta could not provide for herself the goods or services necessary to avoid physical harm and was instead reliant upon APS or first responders to provide these services. This was clearly demonstrated at the hearing by the incident where she had an appointment for dialysis but ultimately had to be assisted by Fireman Goschinski and other first responders to get to the appointment because both Tejpersuad and Deon were too intoxicated to help her get up from the floor.

{¶ 60} In sum, the evidence established that Neta needed assistance for all of her

basic needs. The two people in Neta's life who should have been capable of acting as caretakers and providing for those needs could not do so due to their alcohol abuse and medical issues. We find no error with respect to the court's finding that Neta was in need of protective services, that she was neglected, and that she was an incapacitated person under R.C. 5101.682(B).

### C. Placement Outside of Home

{¶ 61} Neta also argues that the court erred in placing her outside of her home. R.C. 5101.682(C) provides:

> If the court orders placement under this section it shall give consideration to the choice of residence of the adult. The court may order placement in settings which have been approved by the department of job and family services as meeting at least minimum community standards for safety, security, and the requirements of daily living. The court shall not order an institutional placement unless it has made a specific finding entered in the record that no less restrictive alternative can be found to meet the needs of the individual.

{¶ 62} Neta argues that the court failed to consider her choice, which was to return home. She contends that her home met the minimum community standard for safety, security, and the requirements of daily living.

{¶ 63} Initially, we note that the probate court did consider Neta's choice. The court specifically noted that Neta's only desire was to move home. But for the reasons previously stated, living in her private residence was not feasible because Neta required round-the-clock care and her caretakers could not be trusted to protect her.

{¶ 64} And contrary to her argument, the evidence did not establish that Neta's home was a safe, secure place. Frick testified to the "deplorable" conditions in the home when she first met Neta. These conditions included rotten food and plates on the floor, moldy plates and dishes in the sink that had not been cleaned for months, and a refrigerator with an overwhelming smell. There was no evidence presented concerning the more recent

condition of the home. However, Gibson testified about observing a plastic wash basin full of dirty adult diapers.

{¶ 65} Regardless of the hygienic quality of the home, there was ample testimony that Neta shared her home with two family members with serious, ongoing alcohol abuse issues. There was evidence presented that both men could become emotional and violent when intoxicated and that both had caused Neta physical harm while intoxicated. Due to her physical limitations, the evidence demonstrated that Neta was incapable of protecting herself when Tejpersuad and Deon were intoxicated.

{¶ 66} The record also supports the probate court's conclusion that a placement in a nursing home was the least restrictive alternative available necessary to meet Neta's needs. As described above, Neta required round-the-clock care and attention and could not receive such attention and care while living with Tejpersuad and Deon and receiving limited hours of in-home care.

### III. Conclusion

{¶ 67} The record contains competent and credible evidence supporting the probate court's decision to grant an order of protective services. APS established that Neta was a person in need of protective services, that she was neglected and incapacitated, and that a placement outside of her home was the least restrictive alternative available to meet her needs. R.C. 5101.682(B). The probate court's decision was not against the manifest weight of the evidence and the court did not lose its way. *In re L.C.W.*, 2015-Ohio-61 at ¶ 14.

{¶ 68} Judgment affirmed.

M. POWELL, P.J., and PIPER, J., concur.